**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

MALEATRA MONTANEZ,

                              Plaintiff,                    6:16-cv-00550 (BKS/TWD)

v.

CITY OF SYRACUSE; POLICE OFFICER CHESTER D.
THOMPSON; CHIEF OF POLICE FRANK L. FOWLER;
and POLICE CAPTAIN THOMAS GALVIN,

                              Defendants.

_____

**Appearances:**

_For Plaintiff:_

Edward Sivin
Sivin & Miller, LLP
20 Vesey Street, Suite 1400
New York, NY 10007

_For Defendants City of Syracuse, Frank L. Fowler, and Thomas Galvin:_

Khalid Bashjawish
Assistant Corporation Counsel, City of Syracuse
233 E. Washington Street, Suite 300
Syracuse, NY 13202

John G. Powers
Paul J. Tuck
Hancock Estabrook LLP
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Maleatra Montanez brings this action against Defendants City of Syracuse (the

"City"), Police Officer Chester D. Thompson, Chief of Police Frank L. Fowler, and Police

Captain Thomas Galvin. (Dkt. No. 1). These claims arise from Plaintiff's allegation that, on February 14, 2015, Thompson, a patrol officer with the Syracuse Police Department ("SPD"), reported to her residence in response to a 911 call and, while he was there, directed her to engage in sexual acts with him. (Dkt. No. 1).[1] Plaintiff brings: (1) a battery claim against Thompson and the City; (2) an intentional infliction of emotional distress ("IIED") claim against Thompson and the City; (3) a prima facie tort claim against Thompson and the City; (4) a negligent hiring, training, supervision, and retention claim against the City; (5) a Fourth Amendment excessive force and unreasonable search and seizure claim against Thompson; (6) a Fourteenth Amendment substantive due process claim against Thompson; (7) a supervisory liability claim against Fowler; (8) a supervisory liability claim against Galvin; and (9) a *Monell* municipal liability claim against the City. (*Id.*). The City, Fowler, and Galvin[2] move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 89). Plaintiff does not oppose dismissal of her battery, IIED, prima facie tort, and negligent hiring claims against the City but otherwise opposes summary judgment and submits evidence in support of her contention that there are material issues of fact requiring trial. (Dkt. No. 97, at 5). Defendants move to strike certain aspects of that evidence, (Dkt. No. 102), and Plaintiff opposes the motion to strike. (Dkt. No. 107). The Court held oral argument on January 8, 2019. For the reasons that follow,

---

[1] The facts regarding this encounter are disputed. Defendants assert that the sex was consensual. (Dkt. No. 89-1, at 9; Dkt. No. 99-3, at 72–99). Plaintiff says that she complied with Officer Thompson's direction to give him oral sex because she was terrified; that he raped her after directing her to get a condom; and that she went to the hospital the next day to report the rape. (Dkt. No. 99-2, ¶¶ 5–9). That dispute is immaterial to the resolution of the present motion. Construing the facts in the light most favorable to the Plaintiff, the Court refers to the incident as a sexual assault.

[2] For convenience, the Court refers to the City, Fowler, and Galvin collectively as "Defendants." This reference does not include Defendant Thompson, who is represented by separate counsel and has no motion before the Court at this time.

Defendants' motion for summary judgment is granted in part and denied in part, and Defendants' motion to strike is denied.

## II.     FACTS[3]

### A.     Thompson's Employment at SPD[4]

Thompson began his employment as a patrol officer with the SPD on January 3, 1997. In general, during his shifts, Thompson worked by himself—without a partner—and drove a marked SPD vehicle. (Dkt. No. 99-3, at 9). On February 15, 2015, the day after he allegedly sexually assaulted Plaintiff, Thompson was suspended pending investigation of Plaintiff's complaint. (Dkt. No. 89-31, at 4). The SPD terminated Thompson's employment following the investigation. (Dkt. No. 89-10, ¶ 91). Prior to the incident at issue in this case, Thompson was the subject of five complaints, four of which the SPD investigated or responded to in some manner.

### B.     Prior Complaints

#### 1.     1999 to 2001 – Bassett/Malenick Complaint

Cheryle Bassett has submitted a declaration detailing the following contact with Thompson. (Dkt. No. 99-10). Bassett met Thompson at some point between 1999 and 2001, when he pulled over her motor vehicle "because of a traffic infraction." (Dkt. No. 99-10, ¶¶ 1, 3; Dkt. No. 99-16, ¶ 2). Bassett told Thompson that she was struggling financially and "he offered to lease to [her] a portion of a house that he managed" in Syracuse. (Dkt. No. 99-10, ¶ 3). Bassett states that, after she moved in, she fell behind on rent. (*Id.* ¶ 4). Thompson "began to make

---

[3] The facts are drawn from Defendants' statement of material facts, (Dkt. No. 89-2), Plaintiff's responses thereto (Dkt. No. 98), and the attached affidavits, declarations, exhibits, and depositions. The facts are taken in the light most favorable to Plaintiff.

[4] As Defendants seek summary judgment dismissing the negligent training, supervision, and retention claims and § 1983 supervisory and municipal liability claims, the material facts principally relate to Defendants' knowledge of and response to Thompson's alleged misconduct throughout his career as a police officer at the SPD.

sexual advances, which [Bassett] did not rebuke." (*Id.*). Bassett and Thompson "had sexual relations for several weeks and during that time period [Bassett] paid little or no rent." (*Id.*). Subsequently, Bassett was arrested for prostitution. (*Id.* ¶ 5). During an interview with SPD officers, "in an attempt to avoid the criminal charges," Bassett told them about her relationship with Thompson. (*Id.*). According to Bassett, "[t]his appeared to anger the officers," and the charges were dismissed. (*Id.*).

Bassett states that, after "this incident," Thompson was angry with her, and their relationship ended. (*Id.* ¶ 6). Thompson demanded that she pay the back rent, which she was unable to do, and "then demanded that [Bassett] have sex with him," but Bassett "told him that [she] did not want to." (*Id.*). Bassett remained at the residence and attempted to pay Thompson what she owed. (*Id.*). Thompson, however, "threatened" eviction if she "did not have sex with him." (*Id.*). Bassett states that, "[o]ver the next several months," "Thompson showed up at the [residence] at various hours of the day and night, mostly unannounced and often in uniform, and raped me." (*Id.* ¶ 7).

At some point during this time period, Bassett became friends with John Malenick, to whom she confided "what Chester Thompson was doing to [her]." (*Id.* ¶ 8). Malenick advised her to report Thompson to the police, but she "was afraid to do so." (*Id.*). Malenick "then took it upon himself to contact the [SPD] to notify them of what Chester Thompson was doing" to Bassett. (*Id.*). Malenick has submitted a declaration regarding his report. (Dkt. No. 99-16, ¶ 6). In late 2001 or early 2002 Malenick told an officer at SPD's Internal Affairs[5] that he believed

---

[5] Defendant Galvin, who was head of the SPD's Internal Affairs Division—later known as the Office of Professional Standards ("OPS"))—from 1989 until he retired in June 2015, (Dkt. No. 99-8, at 7–9), states in his declaration that "[t]he purpose of OPS is to receive and fairly investigate any complaints made, whether external or internal, against police officers serving within the Department whose conduct is a violation of law or otherwise a failure to comply with Department policies, rules, or regulations." (Dkt. No. 89-10, ¶ 6).

Thompson "had forced [Bassett] to have sex with him and that he threatened to evict her . . . if she didn't have sex with him." (*Id.*). The officer asked whether Malenick had any direct proof of the accusation. (*Id.*). When Malenick said that he did not, the officer responded that "without any direct proof there was nothing that could be done." (*Id.*). There is no evidence of an investigation.

## 2. 2002 – Health Insurance Complaint

In 2002, the SPD received information concerning Thompson's 2000 application for, and procurement of, health insurance coverage for his ex-wife, whom he had divorced in 1995. (Dkt. No. 99-18, at 9). On the application, Thompson filled in the date of marriage but left the marital status box blank. (Dkt. No. 99-18, at 10). As Thompson's ex-wife "appear[ed] not to be an eligible dependent," the SPD commenced an internal investigation. (Dkt. No. 99-18, at 7). As part of the investigation, Captain John Agne from the Human Resources Division and Captain Mark McArdle from the Patrol Services Division, searched SPD records, made inquiries to the health insurance office, and interviewed Thompson. (Dkt. No. 99-18, at 7–12). Captain Agne concluded that his investigation showed "a pattern of the [sic] less than truthful behavior of Ofc. Thompson, as well as the fact that he may have participated in criminal behavior by filing these documents and receiving insurance benefits that he is not entitled to." (*Id.* at 8). Then-Chief of Police Dennis DuVal found Thompson in violation of the SPD's Rules and Regulations governing unbecoming conduct, unsatisfactory performance, and performance of duties, and on October 17, 2002, he issued a letter of reprimand reminding Thompson "that future acts in violation of the Rules & Regulations would bring discredit upon yourself and this Department

and would be dealt with more severely." (Dkt. No. 99-18, at 1).[6] Defendant Galvin personally served the letter on Thompson. (*Id.*).

### 3.    2005–Complaint From Woman at Syracuse Corporation Counsel

According to an October 6, 2005 SPD interdepartmental memo, a woman employed by the Syracuse Corporation Counsel made a complaint of "Unbecoming Conduct" against Thompson ("the SCC complaint"). (Dkt. No. 99-20, at 1). The woman complained that Thompson had "struck up a conversation" with her outside a bar and "offered to follow her home to make sure she made it there safely." (*Id.*). "[O]nce they arrived at her home . . . he walked her on to the porch," and then she "opened the door to let herself in and Officer Thompson walked inside." (*Id.*). The woman said "goodbye so Officer Thompson would leave and Officer Thompson said he needed a hug first." (*Id.*). "She gave him a hug so he would leave and he left." (*Id.*). "[O]n another night," Thompson was working and saw the woman getting out of her car; Thompson thought she flashed her lights "at him wanting to talk." (*Id.*). The woman, however, "related [to Thompson] that she was only locking her car remotely." (*Id.*). Thompson provided a different account of these events. He acknowledged knowing her but stated that "she asked him to follow her home" and that he did not go inside, "request a hug," or "receive or give a hug to her." (*Id.*). The SPD determined that "all that was needed at this time was to talk to Officer Thompson and instruct him not to contact" her; SPD did not speak to her. (*Id.*). Thompson agreed to comply with the instruction "not to have further contact" with her. (*Id.*).

### 4.    2006 – Buske Complaint

In 2006, Candy Buske made a complaint to the SPD about Thompson. (Dkt. No. 99-8, at 14). Buske was "incarcerated at the time . . . on a Robbery charge" and "made it known that she

---

[6] Chief DuVal also suspended Galvin for three days without pay. (*Id.* at 2).

had information about two Syracuse police officers that she would like to provide in order to obtain leniency on her . . . pending criminal charge." (Dkt. No. 89-10, ¶ 37). Then-Chief of Police Gary Miguel[7] instructed Galvin, who was the head of the SPD's Office of Professional Standards ("OPS"), *see supra* note 5, to open an investigation. (Dkt. No. 89-10, ¶¶ 4, 34). Galvin interviewed Buske at the jail on May 17, 2006 (*Id.* ¶ 38). Buske acknowledged that she had a drug habit that she supported through prostitution. (Dkt. No. 99-21, at 1, 11). Buske stated that, in February or March 2006, she was walking "in the area of No. State St . . . between three and four in the morning," when a marked SPD car "pulled up next to" her. (*Id.* at 11). Buske stated that the police officer in the car, whom she identified as Thompson, "called [her] by name and asked if [she] was working." (*Id.*). Thompson told her to "get into the back seat of the car" so he could "run [her] name." (*Id.*). After Buske got into the car, they drove "around the north side of the city" and talked. (*Id.*). Buske believed that there was a warrant for her arrest for violating probation, but concluded that Thompson did not check her name because he did not speak on the radio, use the computer, or ask for her identification. (*Id.*). Thompson asked her if she "would do something for him," which Buske knew meant "something sexual." (*Id.*). Buske "was afraid [Thompson] would arrest [her] if [she] refused" so she said she would. (*Id.*). Thompson asked Buske to "give him a blow job" and she agreed. (*Id.*). Thompson got into the back seat of the car, "unzipped his pants and [Buske] performed oral sex on him." (*Id.* at 12). Afterwards, Thompson gave her twenty dollars, dropped her off, and said he would like to see her again. (*Id.*). Buske stated that she saw Thompson three weeks later, again in a marked SPD vehicle, and that he asked her to meet him in "a little while"; she agreed but "never went." (*Id.*). In addition, Buske

---

[7] Fowler was appointed Chief of Police at some point in 2009. (Dkt. No. 99-7, at 9).

"indicated that her adult daughter, who was also a prostitute and a drug user, also knew, and had some dealings with, Officer Thompson." (Dkt. No. 89-10, ¶ 43).

Galvin "pulled" Thompson's "activity Detail Reports from the beginning of 2006 on occasions where he was working the North side of the City, to see if [he] could place [Thompson] at the location described by Ms. Buske." (*Id.* ¶ 44). "The reports did not conclusively confirm the information provided by Ms. Buske." (*Id.*). Galvin presented a photo array to Buske; "[s]he picked out a photo of Chester Thompson as the police officer that had paid her for oral sex." (*Id.* ¶ 45). Galvin obtained a sworn statement from Buske and included it in the investigation file. (*Id.* ¶ 46).

Galvin states that he also contacted Cari Buske, Candy Buske's daughter, who told him that she met Thompson "in late 2005 or early 2006, and that afterward, Thompson would contact her via cell phone wanting to meet her in person." (*Id.* ¶ 47). Cari Buske stated that she never "had any relationship with him." (*Id.*). Galvin "subpoenaed Cari Buske's cell phone records to try to determine whether Chester Thompson's number appeared," but it did not. (*Id.* ¶ 48). Galvin also researched both Candy and Cary Buske's criminal histories, which contained arrests for prostitution. (*Id.* ¶ 49).

Galvin interviewed Thompson regarding the allegations by Candy and Cari Buske. (*Id.* ¶ 50). Thompson said that "he was, from time to time, involved in investigations on the North side of the City that involved him stopping prostitutes to obtain information . . . on drug houses and illegal weapons possession, because he assumed that . . . prostitutes may have inside information on other criminal activity." (*Id.* ¶ 51). Thompson "denied ever having Candy Buske in his police vehicle" or "engaging in any sexual activity with . . . any . . . prostitute, while he was on duty." (*Id.* ¶ 52). Thompson, however, "admitted that approximately eight months

previously he had another prostitute [in] his vehicle, who he could not identify." (*Id.* ¶ 53). Thompson told Galvin that he "did not notify the dispatcher of the transport." (Dkt. No. 99-21, at 6).

During the interview, Galvin showed Thompson a picture of Cari Buske, who was "also a prostitute." (*Id.* at 2, 5). Thompson told Galvin that "he had dealt with her on a call six to eight months ago" and "at that time" obtained her cell phone number. (*Id.* at 5). Thompson acknowledged that he called Cari Buske "on a personal note" "three or four times" and that he should not have called her because "he was married." (*Id.*). Thompson indicated that he "may have" tried to meet with Cari Buske "but that did not occur." (*Id.*). Galvin noted that Thompson was "extremely agitated" during the interview, which led Galvin "to question [Thompson's] denial." (Dkt. No. 89-10, ¶ 56).

Following the interview, Thompson submitted a memo to Galvin regarding Candy Buske's complaint and his knowledge of Cari Buske. (Dkt. No. 99-21, at 9–10). Thompson stated that he stopped Candy Buske six months before, that he asked her why she was in the area, and that Candy Buske responded that she was searching for her daughter Cari Buske, "whom she believed to be in a troubled situation." (*Id.* at 9). As the memo detailed, Thompson told Candy Buske that he knew who her daughter was and that, if he saw Cari, he would tell her that her mother was looking for her. (*Id.*). In his memo, Thompson acknowledged that he called Cari Buske's "cell phone approximately 6 times" but did so "at her request" to discuss "matters which she had questions about of a police nature." (*Id.*). Thompson acknowledged that, "approximately 6 to 8 months" previously, a female he believed to be a prostitute "flag[ged] [him] down and ask[ed] if [he] could transport her"; however, Thompson did "not recall if [he] called out on this occasion or not." (*Id.*).

The same day, Galvin completed a case report for Chief Miguel about the complaint against Thompson summarizing his investigation. (*Id.* at 1–7). Galvin noted that there were inconsistencies between Thompson's interview and the memo Thompson submitted after the interview: "His [memo] was consistent with what was stated during the interview, with the exception of telephoning Cari Buske. It was no longer done 'inappropriately', 'on a personal note' but be called her cell phone approximately six times 'at her request' as she had questions of a police nature." (*Id.* at 6).

In the case report, Galvin concluded that the "basic allegation made by Candy Buske" against Thompson had "not been substantiated"[8] but that "some concerns have been raised." (*Id.* at 6). Galvin explained that "Officer Thompson was extremely agitated during the interview, and after having been apprised of Buske's allegation asked several times if that was the only complaint against him. He . . . appeared to have a questionable relationship with prostitutes, repeatedly telephoning Cari Buske 'on a personal note,' and giving one a ride without contacting the dispatcher." (*Id.*). Next to "Recommendation," Galvin wrote: Thompson "violated the Departmental Rules and Regulations regarding persons in police vehicles. Disciplinary action initiated." (*Id.*).

"Consistent with the SPD disciplinary process," Galvin prepared a Discipline Report stating: "In the month of January or February 2006, Officer Chester Thompson did transport a female in his assigned police unit without permission and without notifying the dispatcher," in the SPD's Rules and Regulations. (*Id.* at 16). Galvin sent the Discipline Report, "Investigative

---

[8] Galvin explained that there are three basic findings—unfounded, substantiated, and unsubstantiated—and explained that: "unfounded" means "conduct that is disproved or demonstrated to have not occurred"; "unsubstantiated" means "conduct that is not conclusively disproven but . . . there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred"; and substantiated means "there is sufficient evidence to conclude that the misconduct as alleged has actually occurred." (Dkt. No. 89-10, ¶¶ 16–18).

Case Report, the entire investigation file, and a summary of Officer Thompson's prior disciplinary history" to "the chain of command" and to Chief Miguel. (Dkt. No. 89-10, ¶ 58).

Though he recommended a finding of unsubstantiated as to Buske's allegations, because Galvin found her "description of events as being plausible" and Thompson had been "very nervous" during his interview, Galvin advised Chief Miguel that because Thompson "worked the midnight shift . . . [a]nd that's when prostitutes are out working and they can be manipulated sometimes" it was "something that should be monitored." (Dkt. No. 99-8, at 14–16). Ultimately, "[t]he chain of command . . . recommended," and Chief Miguel ordered, that Officer Thompson be disciplined with a formal letter of reprimand for transporting "a female in his assigned police unit." (Dkt. No. 89-10, ¶¶ 59–60; Dkt. No. 99-21, at 16). Chief Miguel adopted the finding that the Buske allegation was not substantiated. (Dkt. No. 99-21, at 7).

On July 26, 2006, Galvin served the letter of reprimand, signed by Chief Miguel, on Thompson. (Dkt. No. 89-10, ¶ 61). The letter also contained a reminder "that future acts in violation of the Rules and Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 89-14, at 14).

Thompson's duties did not change following Buske's complaint: the SPD did not place any restrictions on him, and he was not aware of any additional monitoring. (Dkt. No. 99-3, at 192). Thompson testified that Galvin never expressed any disapproval of his interactions with Candy Buske or Carrie Buske. (*Id.* at 193).

### 5.  2014 – Melissa Popcun-Roach Complaint

On June 2, 2014, the SPD received a complaint by "Patricia Popcun over the alleged activities of an unidentified [SPD] officer and her thirty-five-year-old daughter Melissa Popcun Roach" at Melissa's home on Cayuga Street in Syracuse. (Dkt. No. 99-6, at 1, 4). Galvin initiated

an investigation, and interviewed Popcun, who related that her daughter Melissa had told her that:

> a Syracuse Police officer followed her into her apartment unannounced and uninvited . . . and that she told the officer that she didn't want any trouble because she already had problems with the police. The officer told her that he would take care of any police problems in exchange for oral sex, which [she] then gave him.

(Dkt. No. 99-5, at 1). Popcun also relayed to Galvin that Melissa said that "[s]he performed the act and the officer left" and that the officer had "worn a wedding ring." (Dkt. No. 99-6, at 1; Dkt. No. 89-10, ¶ 68). Galvin testified that Popcun told him that she felt what the officer had done "wasn't right" and that he had taken "advantage of her daughter, who was a heavy drinker and bipolar medication [sic] and that she was a drug abuser," and that "the officer should have been aware that [her daughter, Melissa,] was not capable of consent." (Dkt. No. 99-8, at 47).

To "determine the identity of the officer in question," Galvin reviewed the Officer Activity Detail Reports for June 1, 2014 and found that Thompson and Officer Thomas Nicolini had responded to the Cayuga Street area "on an animal complaint." (Dkt. No. 89-10, ¶ 72). Since "of the two, only Officer Thompson wore a wedding band," Galvin identified Thompson "as the potential subject." (*Id.*).

Galvin then interviewed Nicolini, who confirmed that he and Thompson had responded to a call in the Cayuga Street area, where a "pit bull . . . had been found running lose." (Dkt. No. 99-6, at 2; Dkt. No. 89-10, ¶ 73). According to Galvin, Nicolini stated that, while they were there, "they were approached by a woman named Melissa," who "stated she had information regarding the owner of the dog that was the subject of the complaint." (Dkt. No. 89-10, ¶ 73).[9]

---

[9] Officer Nicolini's written report to Galvin regarding the incident does not mention any conversation indicating that Melissa had information about the dog. (Dkt. No. 99-6, at 5).

Nicolini reported that "[i]t appeared that Melissa was intoxicated as she was stumbling when she walked and there was alcohol on her breath." (Dkt. No. 99-6, at 5). Nicolini told Melissa "to leave this area due to the aggressive dog." (*Id.*). After Melissa went back inside her apartment, Thompson went to the apartment for roughly 10-15 minutes, and returned "with no more information." (*Id.* at 2, 5).

Galvin next interviewed Thompson, who "admitted going into Melissa Popcun[-Roach's] apartment . . . to attempt to collect information from her about the animal control complaint that was being investigated," "denied that anything improper occurred but indicated that he was not able to learn anything useful from her regarding the investigation." (Dkt. No. 89-10, ¶ 75). Galvin directed Thompson to prepare a written statement, which Galvin "included in the investigation file." (*Id.*; Dkt. No. 99-6, at 6). In his written statement, Thompson maintains that he "spoke briefly" with Melissa in her apartment "for approximately 10 minutes regarding the neighbors [sic] dog." (*Id.*).

Galvin did not obtain a written statement or affidavit from Popcun or Melissa. In a declaration filed in connection with this summary judgment motion, Popcun states that she spoke with Galvin a second time after her daughter was upset about the fact that Popcun reported the incident to the police. (Dkt. No. 89-21, ¶¶ 9–10). Popcun told Galvin that her "daughter did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (*Id.* ¶ 10). Galvin did not interview or attempt to interview Melissa Popcun-Roach. (Dkt. No. 99-8, at 9).[10] After completing the investigation, Galvin prepared a

---

[10] Melissa Popcun-Roach has submitted an affidavit stating that no one from the SPD "ever contacted [her] or, to [her] knowledge, attempted to contact" her. (Dkt. No. 99-4, at 1). She further states that, had someone from the SPD contacted her, she "would have spoken to them and told them about what happened with the police officer." (*Id.*). She "did not contact anyone at the SPD on [her] own because [she] was not in a good mental state during the time period when this incident happened." (*Id.*). She recounts the incident with Thompson as follows:

case report and recommended that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). As described below, Plaintiff has highlighted discrepancies in the evidence regarding aspects of this report, including: (1) Galvin's report that Melissa "refused to meet" and "was not available," (*Id.* at 2) and (2) Galvin's report that Melissa had "retracted her accusations . . soon after they were made," and that Melissa "said it did not happen," (*Id.* at 1–2).

Galvin has explained that he recommended a finding of "unsubstantiated" because he "could not corroborate through first-hand testimony that the incident did occur" and "there were serious credibility issues with Melissa Popcun[-Roach] based on her mother's credible representations that her daughter was struggling with substance abuse and had recanted her original account of the events in question." (Dkt. No. 89-10, ¶ 80; Dkt. No. 99-6, at 1–3). In his report, Galvin stated that "Officer Thompson and I discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations. He was reminded of the penalties should such conduct be verified as true. He understood the Departments [sic] concerns." (Dkt. No. 99-6, at 2). Galvin testified that, during the course of the investigation, he became "aware" of the Buske allegations, which he had investigated in 2006, eight years before. (Dkt. No. 99-8, at 21). The Buske allegations are not referred to in the Popcun-Roach case report.

---

Some time in 2014 a [SPD] officer entered my apartment unannounced and without my permission . . . . I jokingly asked the officer if he could help me with some open traffic tickets. In response, the officer walked over to the couch on which I was seated, unzipped his pants, removed his erect penis, and told me to give him oral sex. The officer had a very scary and demanding demeanor and I was afraid and intimidated by him so I began to give him oral sex.

(*Id.* at 1).

Upon completion of the case report, Galvin sent the Popcun-Roach case file, including the report, to Rebecca Thompson,[11] a deputy chief at the SPD for review and signature. (Dkt. No. 99-9, at 8, 20–21). Deputy Chief Thompson testified that at the time she reviewed the case file, she had no questions or follow up for Galvin. (Dkt. No. 99-9, at 21–22). When she was asked during her deposition about the indication in the case report that Popcun-Roach "refused to meet with any police officers," Deputy Chief Thompson responded that Galvin had told her that he had "reached out" to Melissa Popcun-Roach but that "she would not return any of his calls or give him any information." (*Id.* at 23). Chief Deputy Thompson "concurred with the investigation of Captain Galvin, that it was unfounded" and signed the case report. (*Id.* at 31).

Chief of Police Fowler, as the "final decision" maker, conducted the "final review" of the Popcun-Roach report. (Dkt. No. 99-7, at 28). Fowler testified that he understood that the SPD had received a "complaint from a mother who alleged that her daughter . . . had been coerced to perform oral sex on Officer Thompson." (*Id.* at 22). The only document in the file Fowler recalled receiving in connection with the Popcun-Roach investigation was the case report. (*Id.* at 33). According to his declaration, Fowler "carefully considered all the facts and noted, as discussed by Captain Galvin, that there was no first hand testimony that the act had actually occurred." (Dkt. No. 89-3, ¶ 60). Fowler testified that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her." (Dkt. No. 99-7, at 41). Although Fowler found Ms. Popcun's allegations "concerning," he determined that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct," and explained this "was a judgment call made based on consideration of all the evidence and the

---

[11] There is no familial relation between Defendant Chester Thompson and Chief Deputy Rebecca Thompson.

investigation experience of myself and Captain Galvin."[12] (Dkt. No. 89-3, ¶ 61). Fowler signed

the Popcun-Roach case report, adopting the recommendation that the case be closed as

"unsubstantiated." (Dkt. No. 99-6, at 3).[13] During his deposition, when Fowler was asked

whether, "[a]t the time that [he] signed off on this report" he was "concerned about the

possibility that Chester Thompson had done what was alleged and that he might do it again in the

future," he responded: "No." (Dkt. No. 99-7, at 40).

Thompson testified that he was never disciplined in connection with Popcun-Roach's

allegations, that his duties with the SPD did not change following the investigation, that he did

not perceive that he was being "monitored any more closely than before" the allegations, and that

he was not asked to undergo any training. (Dkt. No. 99-3, at 234–35).

### C.    2015 Montanez Incident

Thompson met Plaintiff Maleatra Montanez approximately eight months after the

Popcun-Roach incident. Plaintiff alleges the following. On February 14, 2015, she "called 911 to

report that her sister had taken [Plaintiff's] minor daughter from Syracuse to Alabama without

[Plaintiff's] permission." (Dkt. No. 98, ¶ 62). Thompson, who was already at Plaintiff's building

on an unrelated call, responded to Plaintiff's apartment. (Dkt. No. 99-3, at 18–19). Plaintiff and

her newborn son were in the apartment. (Dkt. No. 99-2, ¶ 4). Once inside her apartment,

Thompson, who was in uniform and equipped with his service weapon and a baton, (Dkt. No.

---

[12] In his declaration, Fowler states that, in determining the "appropriate discipline for substantiated complaints," he reviews, among other things, "the officer's prior performance history and prior disciplinary history." (Dkt. No. 89-3, ¶ 24). The Popcun-Roach case report, however, recommended, and Fowler adopted, a finding of unsubstantiated. (Dkt. No. 99-6, at 3). There is no evidence that Fowler reviewed Thompson's prior history or that SPD policy required such review in the event of an unsubstantiated finding.

[13] Fowler stated that, at the time he learned of the "incident regarding Melissa Popcun[-Roach]," he was not aware of any other allegations of sexual impropriety by Thompson, and that he did not learn about Buske's allegations until after the present lawsuit. (Dkt. No. 99-7, at 43–44). Galvin, on the other hand, testified that he apprised Fowler of Galvin's concerns that "this is a second time. Even though there was a gap of eight years, it was a similar allegation. She was a vulnerable person, in my perspective, and it would have been easy to take advantage of that, as it would have been with a prostitute." (Dkt. No. 99-8, at 25–26).

99-3, at 53–54), told Plaintiff she "was pretty," "commented on [her] rear end and made a sexual comment about [her] lips." (Dkt. No. 99-2, ¶ 5). "He also started to rub himself in his groin area over his pants" and "then removed his penis from his pants and told [Plaintiff] to 'suck it.'" (*Id.*). Plaintiff "did not try to fight Officer Thompson, but . . . told him 'Whoa, we don't have to do this.'" (*Id.*). "In response, he just repeated, 'suck it.'" (*Id.*). Plaintiff "was terrified for [her] safety and for the safety of [her] newborn son, so [she] began to give Officer Thompson oral sex." (*Id.*). Thompson then told Plaintiff "to get a condom" and raped her. (*Id.* ¶¶ 7–8). The next day, February 15, 2015, Plaintiff went to a local hospital, where she reported that she "had been raped by a Syracuse police officer with the last name 'Thompson.'" (*Id.* ¶ 9).[14]

Fowler learned of the incident the same day Plaintiff reported it, on February 15, 2015. (Dkt. No. 89-13, ¶ 28). Following a briefing, Fowler met with Thompson's supervisor and the police officer who initially interviewed Plaintiff, referred the matter to the district attorney's office for investigation, and, after conferring with Galvin, suspended Thompson pending investigation. (Dkt. No. 89-3, ¶¶ 29–33; Dkt. No. 89-10, ¶ 88). Galvin states that he "recommended the immediate suspension of Officer Thompson . . . pending further investigation of the allegations" "based, in part, on [his] prior experience with Officer Thompson, including the nature of the allegations, though unproven, from the 2006 Buske and 2014 Popcun complaints." (Dkt. No. 89-10, ¶ 88).

---

[14] Thompson disputes her account. Thompson asserts that Montanez initiated the sexual encounter when she "reached back" and "grabbed [him] in his penis area," as he was about to leave her apartment. (Dkt. No. 99-3, at 72–75). According to Thompson, Montanez then led him into the living room, unzipped his pants and began giving him oral sex. (*Id.* at 72–85). Thompson testified that after about three minutes of oral sex Montanez stood up, told him to wait, and got a condom from her bedroom. (*Id.* at 86–90). According to Thompson, Montanez then again began giving Thompson oral sex and he did not enter her vaginally because he had already ejaculated. (*Id.* at 95–99).

Galvin commenced an investigation, which included interviews of Plaintiff and

Thompson, and provided their versions of the incident in a case report dated February 20, 2015.

(Dkt. No. 99-24). Galvin recounted the following aspect of his interview of Thompson:

> This writer asked Officer Thompson why he thought it would be
> allowable for an officer to engage with a complainant in sex,
> whether consensual or not, while on duty. He replied he did not think
> it would be a problem. I asked if he recalled my having counseled
> him six months before in regards to an allegation having been made
> at the time that he had allowed a vulnerable female (drugs, mental)
> to perform oral sex on him while he was on duty and he said that he
> did.

(Dkt. No. 99-24, at 4). Galvin recommended that disciplinary action be initiated. (*Id.*).

An SPD discipline report dated February 24, 2015 contains findings that Thompson

violated SPD's Rules and Regulations governing unbecoming conduct. (Dkt. No. 89-5, at 31).

The report describes the violation as follows: "On 14 February 15 while on duty and during the

course of his official duties, Officer Thompson did engage in sexual intercourse and fellatio with

a female complainant while conducting an investigation at her residence." (*Id.*). The report is

signed by Galvin and Fowler. (*Id.*). According to the report, on February 24, 2015, Galvin

notified Thompson that he was terminated. (*Id.*). A certificate of conviction dated January 11,

2016 indicates that Thompson was convicted of official misconduct in violation of New York

Penal Law § 195.00[15] and sentenced to three years of probation. (Dkt. No. 89-9).

### D. Rumors and Other Alleged Incidents

Plaintiff has submitted evidence of Thompson's alleged sexual activity with respect to

four other women while on duty. (Dkt. No. 99-15; Dkt. No. 99-23; Dkt. No. 99-3, at 139–

---

[15] New York Penal Law § 195.00, as relevant here, provides that: "A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: 1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized."

40;195–209, 236–43). It is undisputed, however, that these alleged incidents "were not officially reported to the SPD." (Dkt. No. 107, at 6).

Plaintiff has also offered the deposition testimony of John Baggett, who was an SPD police officer at the same time as Thompson, (Dkt. No. 99-14, at 11, 30), who testified that "rumors were running rampant throughout the SPD" concerning allegations that, while on duty, Thompson had "sexually assaulted" women. (*Id.* at 44–45). Baggett could not "pinpoint" when, during his approximately 21-year career, he first started hearing those rumors, (*Id.* at 22), but he believed Miguel might have been Chief of Police when they first came out, (*id.* at 49). To illustrate how "widespread" the rumors were throughout the SPD, Baggett explained that, even though he did not work with or "run in the same circles" as Thompson, the rumors "got to [him] somehow." (*Id.* at 23). Both Galvin and Fowler testified, however, that they had no knowledge of these rumors. (Dkt. No. 99-8, at 30; Dkt. No. 99-7, at 59).

### E.  Brown Declaration

In opposition to Defendants' motion for summary judgment, Plaintiff filed a declaration by Robert Brown, whom she offers as an expert in the area of internal investigations into allegations of police misconduct as well as "strateg[ies] and penalties" in connection with criminal cases against members of a police force. (Dkt. No. 107, at 8). Brown has been "a practicing attorney[16] with an emphasis on criminal defense" for the past 17 years. (Dkt. No. 99-13, ¶ 4). Prior to becoming an attorney, Brown worked for the New York Police Department ("NYPD"), from which he retired "with the rank of captain." (*Id.* ¶ 1). As captain, Brown

---

[16] As an attorney, Brown has "defended both private citizens and law enforcement officials against various criminal charges," has defended "law enforcement officials against civil and administrative charges," and has "represented plaintiffs and defendants in civil actions involving allegations of police misconduct." (Dkt. No. 99-13, ¶ 4). In addition, he has served as a guest lecturer on "police procedures and culture," "police drug enforcement policy," and "police use of force" at three law schools. (*Id.*).

"supervised over two-hundred members of the NYPD." (*Id.*). Brown was also "the Commanding Officer and Chief Investigator of the NYPD's Special Prosecutor's Office." (*Id.*). In this role, he "investigated allegations of police misconduct and conducted administrative interrogations . . . of police personnel accused of high-profile corruption and serious misconduct"; further, he "conducted a department-wide review of all open cases against members of the NYPD and made recommendations regarding strategy and penalties." (*Id.*).

Brown states that his declaration is based on his review of "various documents and deposition testimony generated in connection with" this matter, including the SPD General Rules and Procedure Manual; relevant literature regarding issues of police integrity and proper responses to allegation of police misconduct; and his "years of training and experience" as a criminal defense lawyer and employment with the NYPD and New York City Housing Police Department ("NYCHPD"). (*Id.* ¶ 6). In Brown's opinion, Galvin failed to address "reported instances of misconduct by Thompson" "in a manner that was consistent with" the SPD Manual. (*Id.* ¶ 15). According to Brown, although the SPD manual "prohibits officers from knowingly associating with persons known to have a reputation of criminal conduct except in the performance of their assigned duties, and further prohibits officers from utilizing their on-duty time in the pursuit of private business or association," Galvin did not discipline or recommend discipline against Thompson "for knowingly associating for personal reasons with Cari Buske, a known prostitute." (*Id.*). Brown further notes that, "[w]hen interviewing Thompson in connection with the Buske, Popcun, and Montanez incidents, Galvin also failed to record the interviews mechanically or by a stenographer," "failed to interview Popcun's daughter," "failed to obtain an affidavit from Popcun or her daughter," and "failed to document what he alleges were his unsuccessful attempts to obtain the cooperation of Popcun and her daughter, as required

by the Manual." (*Id.*). In Brown's opinion, Fowler and Galvin "should have made every attempt to interview Popcun's daughter," and "Popcun's alleged statement to Galvin that she did not want her daughter to be interviewed—even if true—did not justify Galvin's failure to interview the daughter." (*Id.* ¶ 18). Brown opines that, following the Popcun-Roach investigation, "the SPD definitely should have implemented" increased monitoring and supervision of Thompson. (*Id.* ¶ 19). Brown further opines that the SPD's "investigations and responses to these prior reported allegations also deviated materially from good and accepted standards of police practice, including the SPD's own internal rules and policies." (*Id.* ¶ 7).

## III.    MOTION TO STRIKE

Defendants seek an order striking from Plaintiff's statement of material facts paragraphs concerning: (1) "rumors that Chester Thompson sexually assaulted women while on duty"; (2) "sexual misconduct about which the SPD was never notified"; and (3) "the declaration of Robert Brown." (Dkt. No. 102-1, at 2).

The evidence concerning "rumors" and Thompson's alleged sexual misconduct against four women, about which the SPD was never formally notified, is discussed above. (*See supra* Section II.D). While the Court finds this evidence insufficient to raise a material issue of fact, (*see infra* Section V.B.2.b.) the Court declines to strike paragraphs concerning this evidence from Plaintiff's statement of material facts.

The Court also declines to strike the paragraph in Plaintiff's statement of material facts that cites Brown's declaration. Plaintiff cites Brown's declaration only once in her statement of material facts, (Dkt. No. 98, ¶ 3), and it is one cite among six. Paragraph 3 of Defendants' statement of material facts, and Plaintiff's responses, are as follows:

> 3.       The Office of Professional Standards ("OPS") is responsible for the SPD's internal affairs function and investigates any internal or external complaints made against any SPD officers whose

conduct is a violation of law or otherwise fails to comply with SPD policies, rules, or regulations. *See* Fowler Decl. at ¶¶ 8, 9.

> *Plaintiff admits only that OPS is responsible for the SPD's internal affairs function and is **obligated** to investigate internal or external complaints made against any SPD officers whose conduct is a violation of law or otherwise fails to comply with SPD policies, rules, or regulations, but denies any suggestion that OPS always complied with that obligation. Specifically, OPS and its predecessor in name, the Internal Affairs Division, either failed to investigate allegations of sexual predation by Chester Thompson or failed to conduct any meaningful investigation of those allegations. See Exhibit 4 (Affidavit of Melissa Popcun), Exhibit 5 (Affidavit of Patricia Popcun), Exhibit 10 (Declaration of Cheryle Bassett), Exhibit 11 (SPD General Rules and Procedure Manual (the Manual), Vol. 1, Article 3, titled "Sex Crime Investigations," Sections 22.13(A)(1),(3), & (9) and Section 22.14(A)(3), Exhibit 13 Declaration of Robert Brown), and Exhibit 15 (Declaration of John Malenick).*

(Dkt. No. 98, ¶ 3). As the proposition for which Plaintiff cites Brown's declaration is supported by other admissible evidence—specifically, the Popcun and Popcun-Roach affidavits (Dkt. Nos. 99-4, 99-5)—and Plaintiff has not offered it for any other purpose, Defendant's motion to strike "the portion of Plaintiff's opposition to Defendants' Statement of Material Facts that relies on the Brown Declaration, as well as the Brown Declaration itself," (Dkt. No. 102-1, at 14), is denied as moot. Any dispute regarding the admissibility of Brown's testimony at trial should be addressed by the parties in a motion in limine. Accordingly, Defendants' motion to strike is denied.

## IV.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## V.    DISCUSSION

### A.    State Law Claims

#### 1.    Battery, IIED, Prima Facie Tort, and Negligent Hiring Claims

Defendants seek, and Plaintiff does not oppose, dismissal of her battery, IIED, prima facie tort, and negligent hiring claims against the City. (Dkt. No. 97, at 5). Accordingly, those claims are dismissed against the City.

#### 2.    Negligent Training, Supervision, and Retention

The City moves for summary judgment dismissing the negligent training, supervision, and retention claims as barred by governmental immunity. (Dkt. No. 89-1, at 20–24). Plaintiff argues that the City is not entitled to governmental immunity because its responses to "prior allegations of malfeasance by Thompson were either ignored, involved no real exercise or

discretion, or involved an exercise of discretion that violated the SPD's own internal rules and policies." (Dkt. No. 97, at 23).

"New York courts have held governmental employers liable for placing employees, like police officers who are known to be violent, in positions in which they can harm others." *Gonzalez v. City of New York*, 133 A.D.3d 65, 68 (1st Dep't 2015). "A necessary element of a cause of action alleging negligent retention or negligent supervision is that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.'" *Bumpus v. N.Y.C. Transit Auth.*, 47 A.D.3d 653, 654 (2d Dep't 2008) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161 (2d Dep't 1997)).

Under New York law, municipalities, however, enjoy governmental immunity when "official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." *Mon v. City of New York*, 78 N.Y.2d 309, 313 (1991). Immunity "insulates a municipality for its employees' performance of their duties where the . . . conduct involves the exercise of professional judgment such as electing one among many acceptable methods of carrying out tasks, or making tactical decisions." *Johnson v. City of New York*, 15 N.Y.3d 676, 681 (2010) (quoting *McCormack v. City of New York*, 80 N.Y. 2d 808, 811 (1992) (internal quotations omitted)). When, however, "the retention of an employee may involve a known risk of bodily harm to others, the field in which [a police official's] discretion may be exercised . . . is limited [and] is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *McCrink v. City of New York*, 296 N.Y. 99, 106 (1947). Further, "immunity . . . presupposes that judgment and discretion are exercised in compliance with the municipality's procedures, because 'the very basis for the value judgment supporting immunity and denying individual recovery becomes irrelevant where the

municipality violates its own internal rules and policies and exercises no judgment or discretion.'" *Johnson*, 15 N.Y.3d at 681 (quoting *Haddock v. City of New York*, 75 N.Y.2d 478, 485 (1990)).

A municipality is not, therefore, entitled to summary judgment based on immunity if there is a question of fact as to whether the employees' conduct at issue violated applicable procedures. *See*, *e.g.*, *id.* (affirming summary judgment in favor of the city after finding no question of fact "as to whether officers' discharge of their firearms violated the [NYPD deadly physical force] guideline"); *Newsome v. Cty. of Suffolk*, 109 A.D.3d 802, 802–03 (2d Dep't 2013) (denying summary judgment to municipality because there was "[a] question of fact with respect to whether the conduct of the dog's handler was consistent with acceptable police practice"); *Galapo v. City of New York*, 219 A.D.2d 581, 582–83 (2d Dep't 1995) (finding "triable issues of fact with respect to whether Officer Martin's actions were consistent with or in contravention of the procedures relating to use of firearms as set forth in the New York City Police Department Patrol Guide"); *see also Lubecki v. City of New York*, 304 A.D.2d 224, 235 (1st Dep't 2003) (ruling that city is not immune when "the evidence established that the police violate clearly established protocols and procedures" concerning the discharge of weapons).

In this case, construing the record in the light most favorable to Plaintiff, the SPD was aware of allegations that Thompson had forced a woman (Bassett) to have sex with him on threat of eviction in 2001; coerced another woman (Buske) who was afraid of being arrested to give him oral sex in 2006; and offered to expunge the criminal record of an intoxicated woman (Popcun-Roach) in exchange for oral sex in 2014. Although there was no investigation of, and thus no exercise of discretion regarding, the first allegation concerning Bassett, the City argues that this complaint is "immaterial" and cannot be a "cause in fact or proximate cause" of

Plaintiff's injuries because "over thirteen years separates the alleged . . . complaint and the incident at issue." (Dkt. No. 103, at 7–8). The City further argues because Galvin and Fowler exercised discretion in investigating and responding to Thompson's two other alleged acts of misconduct (Buske and Popcun-Roach), governmental immunity applies. (Dkt. No. 89-1, at 23).[17]

Even assuming that the first two complaints (Bassett and Buske) were temporally too distant to be a proximate cause of Plaintiff's injuries, or, in the case of the Buske complaint, the investigation entailed an exercise of discretion to which immunity attaches, there are triable issues of fact as to whether Galvin's actions in the Popcun-Roach investigation were consistent with the SPD's procedures and within the realm of acceptable practice.

The procedures governing complaints of police officer misconduct require that the supervisor or command officer "document a preliminary investigation to include: (a) [i]nterviewing the complainant; (b) [o]btaining, as soon as practical, an affidavit . . . containing details of his/her complaint; [and] (c) [l]ocating and interviewing available witnesses." (Dkt. No. 99-11, at 47).[18] Galvin himself acknowledged "the importance of interviewing every percipient witness to an event" and agreed that he would consider contacting

[17] As the commanding officer of OPS and chief of Police, Galvin and Fowler were required to exercise discretion and judgment in the investigation of complaints, determinations regarding whether complaints were substantiated and, if substantiated, determinations regarding the appropriate discipline. The City has submitted evidence outlining the SPD procedures for investigating a complaint against an officer as well as the disciplinary, supervisory, and training options available when needed. (*See, e.g.*, Dkt. No. 89-12 (SPD "Disciplinary System" Policy); Dkt. No. 89-3, ¶ 26 (Fowler Declaration listing disciplinary options); Dkt. No. 89-10, ¶¶ 11–33 (Galvin Declaration detailing "Process for Investigating and Adjudicating Police Misconduct")).

[18] Plaintiff cites the SPD procedures for "sex crime complaints" which require that the investigator "[c]onduct a detailed interview and obtain the victim's affidavit." (Dkt. No. 99-11, at 13, section 22.14(A)(3)). Defendants argue that this was not a sex crime complaint and rely on the procedures applicable to complaints made against the police. (*Id.* at 43). For the purposes of this motion, the Court has considered the procedures applicable to complaints made against the police.

Popcun-Roach to be the "most essential aspect of [his] investigation." (Dkt. No. 89-10, ¶ 78; Dkt. No. 99-8, at 42).

Galvin maintains his decision not to interview Popcun-Roach "was a very difficult judgment call," (Dkt. No. 89-10, ¶ 78), and the Defendants argue that the City of Syracuse is immune from any errors in the judgments made by Galvin and Fowler in their discretionary decisions. Plaintiff, on the other hand, argues she has raised a triable issue of fact as to whether Galvin's acts were a consistent and acceptable method of complying with SPD procedures, noting that not only did Galvin not interview Popun-Roach or obtain any affidavit from Popcun-Roach, but that he has provided entirely different explanations for this failure. (Dkt. No. 97, at 8–9).

In his case report Galvin stated that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 2). Chief Deputy Thompson and Fowler, the officers who were responsible for deciding whether to adopt his recommendation that the complaint be deemed unsubstantiated, testified that Galvin told them that he had "reached out" to Popcun-Roach but that "she would not return any of his calls or give him any information," (*see also* Dkt. No. 99-7, at 41 (Fowler testifying that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her")). His case report does not refer to any attempts to contact Popcun-Roach, and Galvin acknowledged during his deposition that he did not in fact attempt to contact Popcun-Roach. (Dkt. No. 99-8, at 9).

Plaintiff notes that Galvin's most recent explanation for not interviewing Popcun-Roach is "completely different" from what he reported in his report and what he told his superiors. (Dkt. No. 97, at 9). In his deposition and declaration submitted in support of his motion for summary

judgment, Galvin states that Popcun was "adamant that [he] not speak with her daughter," who "had bipolar problems" and "was an alcoholic," because Popcun was raising her daughter's child and "was afraid that if she had sent to the police to talk to her daughter about the alleged incident" it might cause a "rift" and "some problem with the parents raising the . . . child." (Dkt. No. 99-8, at 34). This explanation is not reflected in Galvin's report, any statement from Popcun or any other contemporaneous records concerning the investigation. To the extent that this was in fact Galvin's discretionary decision, it was undocumented and apparently unknown to the supervisors tasked with reviewing Galvin's report and making a judgment regarding Thompson's conduct.

In addition, Galvin stated in the case report, and to Fowler, that Popcun told him that "her daughter [had] refuted the claim and said it did not happen." (Dkt. No. 99-6, at 1). Since Galvin did not interview Popcun-Roach or obtain an affidavit from either Popcun or Popcun-Roach, there is no witness statement documenting this alleged refutation. And Popcun avers that she told Galvin something different; she states that she said that Melissa "did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (Dkt. No. 89-21, ¶ 21). The difference between a representation that an alleged victim threatened to recant an allegation to avoid speaking to law enforcement and a representation that an alleged victim expressly stated that that the alleged incident "never happened," may be material to a decision-maker assessing both the investigation and whether the alleged misconduct was substantiated. Indeed, Fowler stated in his declaration that he "carefully considered," among other things, the fact that "Melissa Popcun, had, according to her mother, recanted the story and 'said that it did not happen,'" in determining that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct." (Dkt. No. 89-3, ¶¶ 60–61).

There are, therefore, factual questions as to whether Galvin complied with the SPD's procedures requiring that he document an investigation including an interview of the complainant, and an affidavit containing details of the complaint and interview available witnesses. (Dkt. No. 99-11, at 47 (section 8.16(D)(2)). Since the outcome of that investigation was determinative of whether Thompson would return to his solo patrol duties, unsupervised and without additional training, which "may involve a known risk of bodily harm to others," if, as he was likely to, he encountered vulnerable individuals on patrol, *McCrink*, 296 N.Y. at 106, "the field in which [the officers'] discretion" could be exercised, was "limited" and "superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *Id*. Thus, while Galvin had the authority to exercise discretion in his investigation, under the circumstances of this case, there is a triable issue of fact as to whether he exercised that discretion consistent with SPD's procedures and whether it was one of "many acceptable methods of carrying out" the investigation. *Kenavan v. City of New York*, 70 N.Y.2d 558, 569 (1987), *superseded by statute on other grounds as recognized by Galapo v. City of New York*, 95 N.Y.2d 568 (2000).

Citing *Mon*, the City argues that where a municipality's officers have exercised discretion, a procedural violation does not render governmental immunity inapplicable, and that it is only inapplicable when there is a "total failure to exercise discretion." (Dkt. No. 103, at 3). In *Mon*, the Court of Appeals found that the discretionary hiring of the employee at issue did not violate the applicable civil service rules because the rules were "permissive," the "applicant's nondisclosures" of a prior disorderly conduct conviction was not "such as would mandate his disqualification" under the rules, and "any violation" of the "provisions" "was because the officials *did exercise their discretion*, but did so improperly." 78 N.Y.2d at 316–17. In contrast,

here, the SPD's provisions governing an investigation are not permissive, (*see* Dkt. No. 99-11, at 47 ("Command Officer . . . *shall* . . . document a preliminary investigation to include . . .) (emphasis added)). And here, unlike *Mon*, there is a triable question of fact as to whether Galvin exercised his discretion in compliance with SPD procedures. It will be up to the jury to decide whether his alleged negligent investigation was "an error of judgment and immune from liability," or was, instead, "outside the realm of accepted practice and therefore actionable." *See Kenavan*, 70 N.Y.2d at 571 (Titone, J. dissent). Thus, the City's motion for summary judgment dismissing the negligent retention, supervision, and training claim on grounds of governmental immunity is denied. [19]

## B.    Section 1983 Claims

### 1.    Plaintiff's Constitutional Claim

Plaintiff alleges that Thompson violated her Fourth Amendment right "to be free from the use of excessive force and unreasonable searches and seizures" and her Fourteenth Amendment right to substantive due process. (Dkt. No. 1, ¶¶ 78–81). The parties have not addressed which constitutional provision applies to Plaintiff's allegations. Although Thompson was in Plaintiff's apartment in response to a 911 call, and thus on police business, there is no evidence that Thompson sexually assaulted Plaintiff during the course of an arrest or seizure or that Plaintiff was under suspicion of criminal activity. Thus, for the purposes of this motion, the Court assumes that Plaintiff's "claim is appropriately analyzed pursuant to the Fourteenth Amendment's guarantee of substantive due process." *Poe v. Leonard*, 282 F.3d 123,137 (2d Cir. 2002) (citing, *inter alia*, *Haberthur v. City of Raymore*, 119 F.3d 720, 723–24 (8th Cir. 1997) (concluding that the plaintiff, who was not under arrest or under suspicion of criminal activity,

---

[19] The parties refer to training, supervision, and retention as one claim. As neither party has briefed the substantive elements of these claims, the Court does not address them.

adequately alleged that police officer's sexual assault violated her substantive due process right to bodily integrity or privacy) and *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that claim brought by a plaintiff, who was not arrested or a criminal suspect but was raped by a police officer, was properly viewed as asserting a violation of her substantive due process right to bodily integrity under the Fourteenth Amendment, rather than as a violation of her Fourth Amendment rights)).

"The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). The Second Circuit has explained, however, that "the Due Process Clause 'does not transform every tort committed by a state actor into a constitutional violation.'" *Id.* (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989)). "Government action resulting in bodily harm is not a substantive due process violation unless 'the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* (quoting *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005)).

Courts have recognized a police officer's use of his position to coerce sex as a violation of a right to bodily integrity that violates substantive due process. *See, e.g.*, *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 513 (8th Cir. 2015) (noting that an encounter in which a woman who was followed home by "an on-duty, armed, and uniformed officer," who entered her house "demanded that she undress, and had sexual intercourse with her," was "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate government objective," even though she did not object); *see also United States v. Giordano*, 260 F. Supp. 2d 477, 484 (D. Conn. 2002) (explaining that the Fourteenth Amendment right to bodily

integrity "includes the right to be free from . . . coerced sexual activity."); *c.f. Poe*, 282 F.3d at 139 (holding that police officer's manipulation of the situation in making a police training video "to ensure that [the plaintiff] would be videotaped unclothed from the waist up" "all while purporting to act for the benefit of the police academy" qualified as "conscience-shocking" in violation of the Fourteenth Amendment). Mindful of these principles, the Court turns to Defendants' motion for summary judgment on the federal claims.

### 2. Supervisory Liability

Defendants Galvin and Fowler seek summary judgment dismissing Plaintiff's claims that their failure to supervise and discipline Thompson caused the violation of her constitutional rights. Plaintiff opposes dismissal of her supervisory liability claims.

"A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe*, 282 F.3d at 140. As the Second Circuit has explained, the personal involvement of supervisory personnel may be shown through evidence that they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that an unconstitutional act was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

Before proceeding to the merits, the Court must address the argument Defendants Fowler and Galvin have advanced concerning the continued viability of the *Colon* factors. (Dkt. No. 89-1, at 24). Defendants assert that, in view of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the personal

involvement of a supervisory defendant may no longer "be proven by evidence that the supervisory defendant's conduct met any of the five so-called *Colon* factors, which, inter alia, purported to equate 'personal involvement' with types of indirect involvement." (*Id.*). Thus, Defendants argue, where, as here, there is no evidence that they "participated in, were present for, ordered, or acquiesced to the alleged sexual assault of the Plaintiff," they cannot be held liable. (Dkt. No. 89-1, at 24).

In *Ashcroft v. Iqbal*, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. 662, 676 (2009). The Court noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion or national origin, in violation of the First and Fifth Amendment. *Id.* at 668–69. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.*

While "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), the Second Circuit has not resolved this conflict, *see Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, . . . 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.'" (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013))).

As Defendants note, some district courts have held that only the first and third *Colon* factors survive *Iqbal*. (Dkt. No. 89-1, at 25 (citing *Bouche v. City of Mount Vernon*, No. 11-cv-5246, 2012 WL 987592, at *8, 2012 U.S. Dist. LEXIS 40246, at *27 (S.D.N.Y. Mar. 23, 2012))). However, "neither the Second Circuit nor the Supreme Court has endorsed this reading of *Iqbal*," and the Court declines to follow that caselaw. *Doe v. New York*, 97 F. Supp. 3d 5, 12 (E.D.N.Y. 2015) (quoting *Cano v. City of New York*, 44 F. Supp. 3d 324, 336 (E.D.N.Y. 2014)); *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466, at *48 (S.D.N.Y. Mar. 7, 2016) ("The holding in *Iqbal* does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was 'grossly negligent' or 'deliberately indifferent.'").

As Defendants also note, some courts have continued to apply the *Colon* factors. *See, e.g.*, *Lebron v. Mrzyglod*, No. 14-cv-10290, 2017 WL 365493, at *4, 2017 U.S. Dist. LEXIS 9751, at *11–12 (S.D.N.Y. Jan. 24, 2017) (noting that "[s]ome courts have simply concluded that, in the absence of Second Circuit precedent suggesting otherwise, they will continue to apply the Colon test.") (citing *Doe*, 97 F. Supp. 3d at 12 and *Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429 at *7 n.6, 2014 U.S. Dist. LEXIS 182153, at *19 n.6 (N.D.N.Y. August 5, 2014), *report and recommendation adopted by,* 2015 WL 670429, 2015 U.S. Dist. LEXIS 18601 (N.D.N.Y. Feb. 17, 2015)). Defendants urge the Court not to adopt this position because the Supreme Court reversed the Second Circuit's application of the *Colon* factors in *Iqbal*. (Dkt. No. 89-1, at 25–26).

Many district courts have considered "the constitutional provision at issue," *Iqbal*, 556 U.S. at 676, in determining whether to apply the *Colon* factors. *See, e.g.*, *Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917, at *25 (S.D.N.Y. May 9,

2011); *Qasem v. Toro*, 737 F. Supp. 2d 147, 151–52 (S.D.N.Y. 2010). Some of these courts have concluded that "where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.'" *Id.* They have thus applied the *Colon* factors when the constitutional claim relies on "the unreasonable conduct or deliberate indifference standards of the Fourth, Eight or Fourteenth Amendments." *Shepherd v. Powers*, No. 11-cv-6860, 2012 WL 4477241, at *10, 2012 U.S. Dist. LEXIS 141179, at *34–35 (S.D.N.Y. Sept. 27, 2012) (collecting cases). Other courts have applied the *Colon* factors as long as the constitutional violation at issue does not require a showing of discriminatory intent. *See, e.g.*, *Carpenter v. Apple*, No. 15-cv-1269, 2017 WL 3887908, at *9, 2017 U.S. Dist. LEXIS 143296, at *29 (N.D.N.Y. Sept. 5, 2017) (collecting cases).

The Court agrees with the reasoning of the cases holding that the *Colon* analysis may still apply where the claim does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.'" *Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917, at *25 (S.D.N.Y. May 9, 2011) (quoting *Qasem*, 737 F. Supp. 2d at 151–52; *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466, at *48 (S.D.N.Y. Mar. 7, 2016) (noting that all five *Colon* factors should be viable for false arrest and excessive force claims based on an objectively reasonable standard, but not for First Amendment retaliation claims which have an intent requirement); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in

*Colon v. Coughlin* may still apply."). In this case because Plaintiff's claims do not require a showing of discriminatory intent and are based on the unreasonable conduct standard of the Fourteenth Amendment, the Court will apply the *Colon* factors.

### a.     Defendant Galvin

Plaintiff argues that Galvin acted with gross negligence and deliberate indifference in supervising and disciplining Thompson.[20] (Dkt. No. 97, at 26). The Second Circuit has explained that "'gross negligence' denotes a higher degree of culpability than mere negligence" and "is 'the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" *Raspardo*, 770 F.3d at 116 (quoting *Poe*, 282 F.3d at 140 n.14, 146). "The standard of gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Id.* Thus, Plaintiff "must allege sufficient facts to raise a triable issue of fact as to whether [Galvin] knew or should have known that there was a high degree of risk that [Thompson] would behave inappropriately with a woman [while on duty], but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [Plaintiff]." *Poe*, 282 F.3d at 142.

---

[20] To the extent Plaintiff argues that Galvin and Fowler are subject to supervisory liability based on their alleged failure to act on information that a constitutional violation was occurring, (*see* Dkt. No. 97, at 26 ("Fowler and Galvin can be found liable under § 1983 pursuant to the fourth and fifth *Colon* factors, i.e., if they were 'grossly negligent' in supervising Thompson or if they 'exhibited deliberate indifference' rights of others by 'failing to act on information indicating that unconstitutional acts' were being committed by Thompson.")), the Court notes that there is no evidence that either Galvin or Fowler knew that Thompson allegedly sexually assaulted Plaintiff until after she formally complained the following day. *See, e.g.*, *Raspardo*, 770 F.3d at 124 (finding "no evidentiary basis to conclude that Gagliardi knew that Carlone was sexually harassing Russell or Raspardo and impermissibly allowed this harassment to continue" where the "plaintiffs did not report the sexual harassment of them by Carlone until after Gagliardi had already placed Carlone on administrative leave").

Here, viewed in the light most favorable to Plaintiff, there is evidence that Galvin received two complaints—the 2006 Buske complaint and 2014 Popcun-Roach complaint—that Thompson, while on duty, had coerced women into sexual acts. Galvin acknowledged having concern about Buske's complaint because he found her "description of events as being plausible" and Thompson was "very nervous" during his interview. Although Galvin recommended that Buske's complaint be deemed "unsubstantiated," he advised Chief Miguel that Thompson's midnight shift hours "should be monitored" because prostitutes working those hours can be manipulated. Although Galvin recommended that the next complaint, from Popcun-Roach, be deemed "unsubstantiated," there is evidence from which a reasonable factfinder could infer that Galvin's investigation of that complaint was inadequate. *See H.H. v. City of New York*, 11-cv-4905, 2017 WL 3396434, at *8, 2017 U.S. Dist. LEXIS 124317, at *25 (E.D.N.Y. Aug. 7, 2017) ("Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."). As previously described, Galvin never attempted to interview Popcun-Roach, and yet represented in his case report that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 1–2). There is nothing in the record of the investigation or in the record currently before the Court to support Galvin's deposition testimony that Popcun was "adamant" that he not speak with her daughter. And Galvin's report that Popcun-Roach "retracted" her claim, and "said it didn't happen" are not supported by what Popcun states she told Galvin. Plaintiff has adduced evidence that Popcun-Roach was willing to speak to police and tell "them about what happened with the police officer."

Drawing all inferences in favor of Plaintiff, the evidence, if credited, would allow a reasonable factfinder to conclude that Galvin, in failing to adequately investigate the Popcun-

Roach complaint, was indifferent to the truth of the allegations that Thompson had engaged in coercive sexual conduct, and "exhibited gross negligence or deliberate indifference to a high risk" that Thompson would violate the rights of other women, and that Galvin's deliberate indifference caused Thompson to violate Plaintiff's rights. *Poe*, 282 F.3d at 140; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("[I]f the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims."). Thus, in view of these factual disputes, summary judgment as to Galvin's supervisory liability is inappropriate.

### b. Defendant Fowler

Plaintiff argues that Defendant Fowler's testimony that he was not "concerned about the possibility that in the future Thompson would do to others what he was accused of having done to [Popcun-Roach]" and his failure to take "precautionary or remedial steps with respect to Thompson" demonstrate his "deliberate indifference to the rights of others." (Dkt. No. 97, at 26). Thus, Plaintiff alleges that Fowler was grossly negligent in the exercise of his supervisory duties.

To establish gross negligence Plaintiff must adduce evidence that Fowler had "reason to know of facts creating a high degree of risk of physical harm to another and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk." *Poe*, 282 F.3d at 140 n.14. The evidence suggesting that Fowler had reason to know that Thompson may have posed a risk of using his position as a police officer to coerce women to engage in sexual acts consists of his evaluation of the Popcun-Roach case report and Galvin's testimony that he advised Fowler there had been a "similar" complaint against Thompson involving a "vulnerable person" eight years before. (Dkt. No. 99-8, at 25–26). There is no other evidence about what Fowler knew about Buske's complaint, which was several years before Fowler became chief, and Plaintiff does not

rely on Galvin's limited testimony. Plaintiff in fact cites to Fowler's testimony that he was *unaware* of Buske's complaint, as evidence of SPD's inadequate response to the Popcun-Roach investigation. (Dkt. No. 97, at 10) (citing Dkt. No. 99-7 at 43, 44, 57) (emphasis added)). In any event, this limited evidence about a "similar" complaint that a prior chief deemed unsubstantiated is, in and of itself, insufficient to raise a material issue of fact as to Fowler's gross negligence.

The Popcun-Roach case report recommended a finding of "unsubstantiated" and indicated that the alleged victim "refused to meet with any police officers," was "not available" for interview and had "retracted" her allegations "soon after they were made" and "said it did not happen." (Dkt. No. 99-6, at 2–3).[21] Nothing in the report or information *provided to Fowler* indicated otherwise. Thus, the Popcun-Roach investigation would not allow an inference that Fowler knew or had reason to know that Thompson posed a high risk of using his position as a police officer to coerce women to engage in sexual acts. *See Raspardo*, 770 F.3d at 124 (concluding that the "prior incidents of misconduct" by the subordinate, which involved, among other things, "allegations concerning improper comments and behavior toward female officers and personnel," "an inappropriate joke about a female officer," picking up female officers in his patrol vehicle despite being ordered not to, and the inappropriate use of a mobile messaging system," all of which supervisor was aware of and in response to which "disciplined [subordinate] through verbal counseling" "were not sufficient to put [supervisor] on notice that [subordinate] was likely to sexually harass" female officers).

---

[21] Further, according to the report, Galvin and Thompson "discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations" and that Galvin had reminded Thompson "of the penalties should such conduct be verified as true." (Dkt. No. 99-6, at 2).

Further, to the extent Plaintiff contends the Popcun-Roach complaint should have prompted Fowler to review Thompson's disciplinary history, such a contention would not raise a material issue of fact as to Fowler's gross negligence. The Buske complaint was deemed unsubstantiated, and "[s]upervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe*, 282 F.3d at 144; *see also Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992) ("Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent.").

Plaintiff cites Baggett's testimony that there were "rampant" rumors regarding Thompson's sexual misconduct toward women while on duty as evidence that Fowler was on notice that Thompson was prone to sexual misconduct with respect to women. Plaintiff argues that the evidence regarding Thompson's sexual misconduct with respect to four other women "corroborates Officer Baggett's testimony that rumors of prior sexual assault by Thompson were rampant." (Dkt. No. 107, at 7). While allegations that other officers were in a position to have seen Thompson's conduct is consistent with Baggett's testimony concerning rumors,[22] Baggett's testimony is conclusory in nature. It contains no specifics concerning the content of the rumors, where they came from, who spread them, or when they were circulating. Further, there is no evidence that Fowler was aware of the rumors or that any complaints had been made to the SPD

---

[22] One of the women, for example, who alleges that in 1997 Thompson followed her into a porta potty at a rock concert; locked the door; and raped her inside; described how a uniformed officer with Thompson remained outside the porta potty during the rape. (Dkt. No. 99-15, at 1–2).

concerning Thompson's conduct with respect to these four women. Thus, the rumors and evidence of unreported incidents are insufficient to create a material issue of fact as to whether Fowler had notice that there was a high degree of risk that Thompson would coerce sex from women while on duty. *See, e.g.*, *Romero v. City of New York*, 839 F. Supp. 2d 588, 608 (E.D.N.Y. 2012) ("[T]he unspecified rumors circulating among students at Richmond Hill about a possible relationship between Mr. Benavides and Ms. Doe is not sufficient to constitute actual knowledge by school officials of sexual harassment, particularly where there is no evidence that any NYCDOE officials even heard the rumors."). Accordingly, Fowler is entitled to summary judgment dismissing the supervisory liability claim.

### c.  Qualified Immunity

Defendants Galvin and Fowler argue that they are entitled to qualified immunity because there are no facts that would have placed them on notice that their conduct violated the Plaintiff's "clearly established" rights and because their decision-making is "only arguably incorrect in hindsight." (Dkt. No. 89-1, at 27; Dkt. No. 103, at 9–10).[23] "Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe*, 282 F.3d at 132 (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001)). "In deciding 'questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.'" *Raspardo*, 770 F.3d at 113 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655 (2014)). "The first prong 'asks whether the facts, taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right[,] . . . [and] [t]he second prong of the qualified-immunity

---

[23] Defendants also argue that they were only on notice that Thompson had committed acts of consensual sex while on duty, but that ignores the reasonable inferences in Plaintiff's favor, i.e., that Officer Thompson coerced sex while on duty.

analysis asks whether the right in question was clearly established at the time of the violation.'" *Id.* (quoting *Tolan*, 572 U.S. at 655–56); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017))). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Here, as Plaintiff has failed to raise a material issue of fact as to Fowler's supervisory liability, the first prong is met, and the Court need proceed no further in the qualified immunity analysis as to Fowler.[24] But the Court has found that the facts, taken in the light most favorable to Plaintiff, raise a material issue of fact as to whether Galvin was grossly negligent in the investigation of and response to allegations of sexual coercion by Thompson. Thus, the Court must turn to the second prong of the qualified immunity analysis; this requires consideration of whether the law Thompson allegedly violated was clearly established as well as whether the supervisory liability theory under which Plaintiff seeks to hold Galvin liable was clearly established. *Grice v. McVeigh*, 873 F.3d 162, 169 (2d Cir. 2017) ("Defendants are entitled to qualified immunity on a supervisory liability claim unless the actions of the supervisor and the subordinate both violate clearly established law."); *see also Poe*, 282 F.3d at 135 (explaining that

---

[24] Even if there were a material issue of fact as to Fowler's gross negligence, Fowler would be entitled to qualified immunity because, interpreting the facts in the light most favorable to Plaintiff, it was not clearly established that Fowler's conduct violated Plaintiff's constitutional rights for the reasons discussed in Section V.B.2.b. *See Poe*, 282 F.3d at 141-147.

the court "must determine whether both laws, the law violated by [the subordinate] and the specific supervisory liability theory under which [the plaintiff] wishes to hold [the supervisor] liable, were clearly established by . . . the time of the incident.").

Thompson's alleged conduct of sexually assaulting Plaintiff after she allowed him into her apartment in response to her 911 call, if proved, "would constitute a violation of Plaintiff's substantive due process right to bodily integrity, a right which was clearly established" in 2015. *Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 352 (D. Conn. 2007). The supervisory liability theory under which Plaintiff seeks to hold Galvin liable was also clearly established at the time of the incident: "Case law clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions." *Poe*, 282 F.3d at 141 (citing *Fiacco*, 783 F.2d at 331 (finding sufficient evidence to support a jury's conclusion that a police chief was deliberately indifferent "to whether or not excessive force was used[]" based on the failure "to conduct a nonsuperficial investigation into civilian claims of excessive force")). Thus, in order to defeat a police supervisor's claim of qualified immunity, Plaintiff

> must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the subordinate] would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury. The issue [with respect to] qualified immunity then, is whether a plaintiff "has . . . proffer[ed] sufficient evidence to meet this standard."

*Raspardo*, 770 F.3d at 123–24 (quoting *Poe*, 282 F.3d at 142).

Here, there are material issues of fact regarding whether Galvin conducted a nonsuperficial investigation into Popcun-Roach's allegation that Thompson, while on duty, coerced her, while she was intoxicated and suffering from mental health issues, to perform oral

sex by promising to help with her police problems. Specifically, the material issues of fact include: (i) whether Galvin misrepresented in his case report and to his superiors that Popcun-Roach refused to meet with police officers, was not available and had retracted her allegation; (ii) whether Galvin failed to account for his "lingering concerns" about Buske's prior allegation of similar coercive sexual misconduct when investigating the Popcun-Roach complaint; and (iii) whether Galvin failed to caution Thompson about such conduct. (Dkt. No. 99-3, at 231–34). On this record, considering all inferences in the light most favorable to the Plaintiff, the Court finds that there are material issues of fact as to whether Galvin knew or should have known that there was a high degree of risk that Thompson would coerce sex from a woman while on duty, and whether, in failing to adequately investigate the Popcun-Roach complaint or caution Thompson in any manner, Gavin disregarded that risk, and that his failure caused Plaintiff's alleged constitutional injury. Accordingly, given these disputed facts, a finding of qualified immunity is inappropriate at this stage.

### 3. Municipal Liability

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Zahra*, 48 F.3d at 685. Further, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Batista*, 702 F.2d at 397; *see also Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. 1980) (holding that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

In this case, Plaintiff's theory of municipal liability is that the City's failure to adequately investigate the complaints against Thompson and supervise him properly amounted to deliberate indifference to the rights of those with whom he interacted as an SPD patrol officer. (Dkt. No. 97, at 27–28). "Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable

under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).

Deliberate indifference, however, "is a stringent standard of fault," *Connick v. Thompson*, 563 U.S. 51, 70 (2011) (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)), "and necessarily depends on a careful assessment of the facts at issue in a particular case," *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). The Second Circuit has instructed that "[t]he operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Id.* (quoting *Amnesty Am.*, 361 F.3d at 128). Deliberate indifference, therefore, "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker[25] 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiff.'" *Id.* (citation omitted) (quoting first *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), then *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

Here, Plaintiff cites five complaints made against Thompson during the course of his career with the SPD to support her claim that Defendant City was deliberately indifferent toward Thompson's misconduct. While the health insurance complaint does not reflect sexual misconduct, the SPD concluded that Thompson had engaged in "a pattern of the less [sic] than truthful behavior." (Dkt. No. 99-18, at 8). The SCC complaint, while troubling to the extent it includes an allegation that Thompson walked inside a woman's home uninvited and then demanded a "hug" before he would leave, (Dkt. No. 99-20), is insufficient to show that Defendant City was on notice that Thompson, while on duty, was coercing women to perform

---

[25] The City makes no argument with respect to who should be considered a policymaker for purposes of the *Monell* analysis; its argument centers exclusively on deliberate indifference. (Dkt. No. 89-1, at 28–33; Dkt. No. 103, at 10–11).

sexual acts. The complaints concerning Bassett, Buske, and Popcun-Roach, in contrast, all allege that Thompson engaged in sexual misconduct toward women, and the latter two allege that Thompson engaged in sexual misconduct while on duty. Though Galvin credited Thompson's explanations, and found the Buske and Popcun-Roach complaints to be "unsubstantiated", this meant only that they were "not conclusively disproven but . . . there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred." (Dkt. No. 89-10, ¶¶ 16–18). In addition, to the issue of material fact already identified regarding the adequacy of the Popcun-Roach investigation, there are material issues of fact as to whether the SPD received and failed to investigate a complaint about Bassett.

If credited, Plaintiff has provided evidence from which a reasonable factfinder could conclude that, had the City adequately investigated the complaints against Thompson and supervised and disciplined him appropriately, Plaintiff's rights would not have been violated. The allegations by Buske and Popcun—that, in performing his patrol duties, Thompson coerced women he encountered to perform sexual acts—"sufficiently resemble" his actions toward Plaintiff so as to render Plaintiff's injury "foreseeable." *H.H.*, 2017 WL 3396434, at *10, 2017 U.S. Dist. LEXIS 124317, at *32. Indeed, even after being investigated twice in connection with the Buske and Popcun-Roach complaint, Thompson indicated to Galvin that he "did not think it would be a problem" "for an officer to engage with a complainant in sex, whether consensual or not, while on duty." (Dkt. No. 99-24, at 4). A reasonable jury could find from this evidence that a more thorough investigation and increased supervision and discipline would have prevented Thompson from engaging in such conduct, and consequently, from violating Plaintiff's rights.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is

**GRANTED** as to the battery, IIED, prima facie tort, and negligent hiring claims against the City

and the supervisory liability claims against Fowler; and it is further

**ORDERED** that the battery, IIED, prima facie tort, and negligent hiring claims against

the City and the supervisory liability claims against Fowler are **DISMISSED with prejudice**;

and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is otherwise

**DENIED** in its entirety; and it is further

**ORDERED** that Defendants' motion to strike (Dkt. No. 102) is **DENIED.**

**IT IS SO ORDERED.**

Dated: January 23, 2019
Syracuse, New York

Brenda K. Sannes
U.S. District Judge