**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MALEATRA MONTANEZ,

                              Plaintiff,                    6:16-cv-00550 (BKS/TWD)

v.

CITY OF SYRACUSE, POLICE OFFICER CHESTER D.
THOMPSON, and POLICE CAPTAIN THOMAS
GALVIN,

                              Defendants.

---

**Appearances:**

*For Plaintiffs:*
Edward Sivin
Glenn D. Miller
Sivin & Miller, LLP
20 Vesey Street, Suite 1400
New York, New York 10007

*For Defendants City of Syracuse and Thomas Galvin:*
Christina F. DeJoseph
Todd M. Long
Assistant Corporation Counsel, City of Syracuse
233 E. Washington Street, Suite 300
Syracuse, New York 13202

John G. Powers
Hancock Estabrook LLP
1500 AXA Tower I
100 Madison Street
Syracuse, New York 13202

*For Defendant Chester Thompson:*
Kevin E. Hulslander
Smith, Sovik, Kendrick & Sugnet, P.C.
250 South Clinton Street, Suite 600
Syracuse, New York 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

Plaintiff Maleatra Montanez brings this action against Defendants City of Syracuse (the "City"), Police Officer Chester D. Thompson, and Police Captain Thomas Galvin. (Dkt. No. 1). This action arises from Plaintiff's allegation that, on February 14, 2015, Thompson, a patrol officer with the Syracuse Police Department ("SPD"), reported to her residence in response to a 911 call and, while he was there, directed her to engage in sexual acts with him. (Dkt. No. 1).[1] Plaintiff brings: (1) a battery claim against Thompson; (2) an intentional infliction of emotional distress ("IIED") claim against Thompson; (3) a prima facie tort claim against Thompson; (4) a negligent training, supervision, and retention claim against the City; (5) a Fourth Amendment excessive force and unreasonable search and seizure claim against Thompson; (6) a Fourteenth Amendment substantive due process claim against Thompson; (7) a supervisory liability claim against Galvin; and (8) a *Monell* municipal liability claim against the City. (*Id.*). Presently before the Court are the parties' motions in limine, (Dkt. Nos. 123, 124).[2] On August 22, 2019, the Court held oral argument on these motions. For the reasons that follow, the parties' motions in limine are granted in part and denied in part.

---

[1] The facts regarding this encounter are disputed. Defendants assert that the sex was consensual. (Dkt. No. 89-1, at 9; Dkt. No. 99-3, at 72–99). Plaintiff says that she complied with Officer Thompson's direction to give him oral sex because she was terrified; that he raped her after directing her to get a condom; and that she went to the hospital the next day to report the rape. (Dkt. No. 99-2, ¶¶ 5–9). That dispute is for the jury's determination.

[2] On September 4, 2019, Defendants filed a supplemental motion in limine. (Dkt. No. 152). The Court will address that motion separately.

## II.    PLAINTIFF'S MOTION IN LIMINE

### A.    Plaintiff's Convictions

Plaintiff seeks to preclude Defendants from introducing at trial evidence of her

convictions. (Dkt. No. 122-1, at 1–2). Defendants oppose this motion and maintain that evidence

of Plaintiff's convictions is admissible under Rule 609 of the Federal Rules of Evidence. (Dkt.

No. 124-3, at 3–7; Dkt. No. 126, at 1). In 2006, Plaintiff was convicted of falsely reporting an

incident in the third degree, in violation of N.Y. Penal Law § 240.50(2),[3] a class A misdemeanor.

(Dkt. No. 130). In 2001, Plaintiff was convicted of welfare fraud in the fifth degree, in violation

of N.Y. Penal Law § 158.05,[4] offering a false instrument for filing in the second degree, in

violation of N.Y. Penal Law § 175.30,[5] misuse of food stamps, food stamp program coupons,

authorization cards, and electronic access devices, in violation of N.Y. Social Services Law §

147,[6] and obtaining public assistance by fraud, in violation of N.Y. Social Services Law § 145.[7]

(Dkt. No. 130-2).  In 2007, 1997 and 1996, Plaintiff was convicted of petit larceny, in violation

---

[3] "A person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she . . . [r]eports, by word or action, to an official or quasi-official agency or organization having the function of dealing with emergencies involving danger to life or property, an alleged occurrence or impending occurrence of a catastrophe or emergency which did not in fact occur or does not in fact exist." N.Y. Penal Law § 240.50(2).

[4] "A person is guilty of welfare fraud in the fifth degree when he or she commits a fraudulent welfare act and thereby takes or obtains public assistance benefits." N.Y. Penal Law § 158.05.

[5] "A person is guilty of offering a false instrument for filing in the second degree when, knowing that a written instrument contains a false statement or false information, he offers or presents it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant." N.Y. Penal Law § 175.30.

[6] "Whoever knowingly uses, transfers, acquires, alters, purchases, transports or possesses food stamps, food stamp program coupons, authorization cards or electronic access devices which entitle a person to obtain food stamps, in any manner not authorized by section ninety-five of this chapter shall be guilty of a class A misdemeanor." N.Y. Soc. Serv. Law § 147(1)(a).

[7] Any person who by means of a false statement or representation, or by deliberate concealment of any material fact, or by impersonation or other fraudulent device, obtains or attempts to obtain, or aids or abets any person to obtain public assistance or care to which he is not entitled, or does any wilful act designed to interfere with the proper administration of public assistance and care, shall be guilty of a misdemeanor, unless such act constitutes a violation of a provision of the penal law of the state of New York, in which case he shall be punished in accordance with the penalties fixed by such law. N.Y. Soc. Serv. Law § 145(1).

of N.Y. Penal Law § 155.25. (Dkt. Nos. 130-3, 130-4, 131-4). In 1996, Plaintiff was convicted of criminal impersonation in the second degree, in violation of N.Y. Penal Law § 190.25(1).[8] (*Id.*).

Rule 609 of the Federal Rules of Evidence provides that, "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement." Fed. R. Evid. 609(a)(2). "The presumption under Rule 609(a)(2) . . . is that the 'essential facts' of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed, are included within the 'evidence' that is to be admitted for impeachment purposes." *United States v. Estrada*, 430 F.3d 606, 615 (2d Cir. 2005). Where, however, as here, "more than 10 years have passed since the witness's conviction" "the conviction is admissible only if . . . its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1).

The Second Circuit has "recognized that Congress intended that convictions over ten years old be admitted 'very rarely and only in exceptional circumstances.'" *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993) (quoting S.Rep. No. 1277, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. (93 Stat.) 7051, 7062)). "Nevertheless, courts in this Circuit have consistently admitted convictions over ten years of age when the prior crimes involved falsification and the credibility of the testifying witness was crucial to the outcome of the current case." *United States v. Chervin*, No. 10-cr-918, 2013 WL 124270, at *5, 2013 U.S. Dist. LEXIS 4012, at *15 (S.D.N.Y. Jan. 10, 2013) (citing *Zinman*, 983 F.2d at 434; *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981)). Ultimately, the Court must determine whether

---

[8] "A person is guilty of criminal impersonation in the second degree when [s]he: 1. Impersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another." N.Y. Penal Law § 190.25(1).

"the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b).

In *Zinman*, 938 F.2d at 434, the Second Circuit affirmed the district court's admission of Zinman's 17-year old conviction for Medicare fraud. It observed that the district court's "on-the-record determination" included findings that "making a false statement to a government agency is a crime akin to perjury, and that Zinman's conviction therefore bore heavily on his credibility," "the jury's assessment of Zinman's credibility was highly relevant to several disputed issues in the case," and "any resulting prejudice to Zinman was substantially outweighed by the probative value of the evidence." *Id.* The Second Circuit found "this determination was supported by the record and was well within the district court's discretion." *Id.*

It is readily apparent from the elements of falsely reporting an incident, welfare fraud, filing a false instrument, and criminal impersonation, that proof of a dishonest act or false statement was required for conviction. The crime of falsely reporting an incident requires proof that the individual charged "[r]eport[ed], by word or action . . . , an alleged occurrence or impending occurrence of a catastrophe or emergency which did not in fact occur or does not in fact exist." N.Y. Penal Law § 240.50(2). Welfare fraud requires proof that the individual, "commit[ed] a fraudulent welfare act and thereby takes or obtains public assistance benefits." N.Y. Penal Law § 158.05. The crime of filing a false instrument requires proof of knowledge that "a written instrument contains a false statement or false information." N.Y. Penal Law 175.30. The crime of criminal impersonation involves falsification and "is clearly one of crimen falsi." *Kelly v. Fisher*, No. 86-cv-1691, 1987 WL 16593, at *2, 1987 U.S. Dist. LEXIS 7947, at *5 (S.D.N.Y. Sept. 2, 1987); *see Estrada*, 430 F.3d at 616 n.3 ("In defining 'dishonesty or false

statement' for purposes of Rule 609(a)(2), the Conference Report on the Federal Rules emphasized that it was referring to convictions 'peculiarly probative of credibility,' such as those for 'perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on [a witness's] propensity to testify truthfully.'" (quoting H.R. Conf. Rep. No. 93–1597, 2d Sess., at 9 (1974), reprinted in 1974 U.S.C.C.A.N. 7098, 710))).

Convictions under New York Social Services Law §§ 145(1), 147(1)(a), however, appear to allow conviction upon proof of, *inter alia*, a "wilful act designed to interfere with the proper administration of public assistance," and the unauthorized use of food stamps, and therefore do not necessarily require proof of dishonesty or a false statement. Likewise, petit larceny does not require proof of a dishonest act or false statement. *See* N.Y. Penal Law § 155.25; *see also United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977) (explaining that "crimes of stealth, such as burglary" and "petit larceny do not come within" Rule 609(a)(2)). Defendants argue that the circumstances underlying the 2007 petit larceny conviction reflect dishonesty. (Dkt. No. 131, at 3-4). Under Rule 609(a)(2), however, the issue is whether the conviction or guilty plea required proof of an act of dishonesty or false statement. *See* Advisory Committee Notes to the 2006 Amendments to Rule 609.[9]

---

[9] Defendants also argue that the 2007 petit larceny conviction is relevant to impeach Plaintiff's deposition testimony that "she was never convicted of a crime after 2001." (Dkt. No. 131, at 4). Having reviewed the testimony, however, the Court finds that it was not definitive and that any minimal probative value is outweighed by concerns under Fed. R. Evid. 403 of wasting time, unfair prejudice and confusing the issues. In her deposition testimony Plaintiff admitted that she was been convicted of crimes "a lot," but that she has not been "in trouble in a long time." When asked when the last time she was convicted of a crime, she said "maybe 2 . . . 2000, 2001, maybe," and that "maybe" her last conviction was in 2001. (Dkt. No. 131-6, at 1). At the same time, she admitted that she was convicted in 2006 for making a false 911 call. (Dkt. No. 124-1, at 109).

Plaintiff's credibility is a central issue in this case; the jury will have to decide whether to credit in whole, or in part, Plaintiff's or Defendant Thompson's version of the events. The jury's assessment of her credibility will be relevant to its determination of whether, for example, Defendant Thompson's actions were coercive and whether she consented. Moreover, Plaintiff's testimony is of critical importance as there were no eyewitnesses. Of the convictions falling into the "dishonesty or false statement" category, the falsely reporting an incident is the most recent. It is 13 years old; the others are 18 to 23 years old.

Making a false report about an incident to authorities bears heavily on Plaintiff's character for truthfulness. Though the age of the conviction diminishes its probative value to some degree, because it directly reflects on the critical issue of Plaintiff's credibility, the Court concludes that the probative value of this evidence outweighs its prejudicial effect. *See, e.g.*, *Zinman*, 983 F.2d 434 (affirming admission of the plaintiff's conviction for making a false statement to a government agency, "a crime akin to perjury," even though it was more than 10 years old, because the conviction "bore heavily on [the plaintiff's] credibility" and "the jury's assessment of [the plaintiff's credibility was highly relevant to several disputed issues in the case"). Although Plaintiff's welfare fraud and filing a false instrument convictions are at least 18 years old, they are relevant to show that Plaintiff's conviction for making a false report to authorities was not an isolated incident of falsity. In light of the critical importance of Plaintiff's credibility in this case, the Court finds the probative value of these convictions outweighs the danger of unfair prejudice. The Court declines to admit the 1996 criminal impersonation conviction, however, as it is too remote in time.[10] Accordingly, Plaintiff's motion to preclude

---

[10] In addition, Defendant Thompson asserts that "[s]ometime in the 1990s," Plaintiff was convicted of felony assault and filing a false police report against her sister. (Dkt. No. 124, ¶¶ 16–17). These convictions are not reflected in the records Defendants provided to the Court in response to the Court's request for records. *See* Text Order dated August 9, 2019. Moreover, a felony assault, that is likely more than 20 years old, is in no way probative of Plaintiff's character

Defendants from introducing evidence of her convictions for making a false statement to authorities, welfare fraud, and filing a false instrument is denied. Plaintiff's motion to preclude evidence of her other convictions is granted.

### B.      Prior Sexual Trauma

Plaintiff seeks to preclude Defendants from introducing evidence that "prior to the February 14, 2015 incident involving Chester Thompson, plaintiff engaged in other sexual behavior." (Dkt. No. 122-1, at 2). Defendants respond that "Plaintiff's previous exposure to sexual violence is relevant and probative to the nature and extent of her alleged compensatory damages and should be admitted as an exception to Fed. R. Evid. 412." (Dkt. No. 126, at 1).

In a civil proceeding involving alleged sexual misconduct, "evidence offered to prove that a victim engaged in other sexual behavior" and "evidence offered to prove a victim's sexual predisposition" is not admissible. Fed. R. Evid. 412(a). The exception to this rule, however, allows a court to "admit evidence offered to prove a victim's sexual behavior or sexual predisposition if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed. R. Evid. 412(b)(2). Rule 412 requires the party intending to offer such evidence to "file a motion that specifically describes the evidence and states the purpose for which it is to be offered." Fed. R. Evid. 412(c)(1)(A). The court must then "conduct an in camera hearing and give the victim and parties a right to attend and be heard. Unless the court orders otherwise, the motion, related materials, and the record of the hearing must be and remain sealed." Fed. R. Evid. 412(c)(2).

---

for truthfulness or on the issue of whether the sexual encounter at issue was coerced by Thompson or consensual, and any possible probative value is outweighed by the danger of unfair prejudice.

Here, Defendants have described the past trauma evidence that they seek to introduce and, at oral argument, proffered evidence that following the February 2015 incident, Plaintiff sought mental health treatment for "past trauma" and "this recent one." (Dkt. No. 126-2, at 2–3). Thus, evidence concerning past sexual trauma may be relevant to a determination of damages. *See, e.g.*, *Doe v. New Fairfield Bd. of Educ.*, No. 3:13-cv-1025, 2014 WL 7271522, at *2, 2014 U.S. Dist. LEXIS 174721, at *7 (D. Conn. Dec. 18, 2014) (allowing discovery regarding the plaintiff's sexual abuse on the ground that the "information is relevant to evaluate the extent of Jane's alleged damages and the cause of her not wanting to attend school" and may "shed[] light on whether Jane's alleged emotional damages were the result of the abuse, the harassment at school, or a combination of both."). An in camera hearing, in accordance with the requirements of Rule 412(c)(2), is scheduled for September 10, 2019.

### C.     Email to John Baggett

Plaintiff seeks to preclude evidence that she sent an email to retired SPD Officer John Baggett requesting that he appear for deposition in this case, in which she wrote: "why won't you help me? We can beat these white people if we just stick together." (Dkt. No. 126-3, at 2). Plaintiff argues that such evidence is irrelevant and any probative value is outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. (*Id.* at 2–3). Defendants respond that the statement is a "party admission that is relevant to Plaintiff's bias." (Dkt. No. 126, at 4). "The law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely." *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976). This evidence, therefore, is admissible as evidence of bias. Accordingly, Plaintiff's motion to preclude evidence of this email is denied.

### III.  MOTION IN LIMINE – CITY OF SYRACUSE AND GALVIN

#### A.  Thompson's 2002 Employment Discipline

Defendants seek to preclude admission of records of the SPD's 2002 investigation into allegations that Defendant Thompson had provided "inaccurate information" on his 2000 application for "group health insurance coverage for his ex-wife" "who was an ineligible dependent" as their marriage had ended in 1995, including the resulting letter of reprimand. (Dkt. No. 123-1, at 2; Dkt. No. 99-18, at 1–14). Plaintiff argues that the records concerning "insurance fraud are relevant to the issue of notice, i.e., these defendants' knowledge of Thompson's pattern of deceit." (Dkt. No. 127-1, at 8).

At oral argument, Defendants conceded that under Rule 608, Plaintiff may question Defendant Thompson about the 2002 "insurance fraud" as it is relevant to his "character for truthfulness." Fed. R. Evid. 608(b). Rule 608(b), however, prohibits the admission of extrinsic evidence . . . to prove specific instances of a witness's conduct to attack . . . the witness's character for truthfulness." *Id.* Plaintiff responds that she intends to introduce these records for another purpose: to show that Galvin, who signed the disciplinary action reports and served the letter of discipline, and the SPD were negligent and acted with deliberate indifference in later investigations into Thompson's alleged sexual misconduct. Plaintiff argues that these records show that Galvin and the SPD failed to consider "Thompson's pattern of deceit" when evaluating the truthfulness of his statements during the later investigations. (Dkt. No. 127-1, at 8).

In general, "[r]elevant evidence is admissible," Fed. R. Evid. 402, unless "its probative value is substantially outweighed by a danger of . . . unfair prejudice [or] confusing the issues," Fed. R. Evid. 403. These records do not concern allegations of sexual misconduct, and therefore would not "put a reasonable supervisor on notice that there was a high risk that [Thompson] would violate another's" Fourteenth Amendment rights by using his position as a police officer

to coerce sex. *Poe v. Leonard*, 282 F.3d 123, 146 (2d Cir. 2002). They are, however, relevant to Galvin's knowledge that Captain John Agne, who questioned Defendant Thompson regarding the insurance matter, had found that Defendant Thompson had not been "truthful" in his interview. (Dkt. No. 99-18, at 4). Defendant Galvin's conclusions that the 2006 and 2012 sexual misconduct complaints against Defendant Thompson were not "substantiated," (Dkt. No. 99-21, at 6; Dkt. No. 99-6, at 3), depended, in part, on Defendant Galvin's evaluation of the truthfulness of the statements Defendant Thompson and the complainants made in the investigatory interviews. Thus, Defendant Galvin's knowledge of, but failure to consider, the finding that Defendant Thompson had not been truthful in a prior investigation, is relevant to the issue of whether Defendant Galvin or the SPD was negligent or deliberately indifferent during the later investigations. Not all of the records, however, are relevant—only the letter of reprimand, which Galvin personally served on Thompson, (Dkt. No. 99-18, at 1), and the disciplinary action reports that charged Thompson with violating the SPD rules and regulations concerning "falsifying reports/documents," (Dkt. No. 99-18, at 2), and "truthfulness," (Dkt. No. 99-18, at 4). The remainder of the disciplinary action reports, which charge unbecoming conduct, unsatisfactory performance, and a violation of performance of duties, (Dkt. No. 99-18, at 3, 5, 6), have little probative value and confuse the relevant issues. Moreover, as there is no indication that Galvin reviewed the memoranda in the file, (Dkt. No. 99-18, at 7–14), the memoranda have no probative value and their admission would be unfairly prejudicial. The Court is cognizant that the introduction of these documents may be prejudicial to Thompson, as they are admissible for the purpose of showing Galvin's state of mind as a supervisor. The parties may therefore propose a limiting instruction on this issue.

## B.        Rumors of Thompson's Sexual Activities on Duty

Defendants seek to preclude testimony by John Baggett, a former SPD police officer, that there were rumors within the SPD that Thompson "had been involved with . . . sexual stuff on the job before," (Dkt. No. 99-14, at 21). (Dkt. No. 123-1, at 6). Plaintiff opposes Defendants' motion. (Dkt. No. 127-1, at 10–11).

Plaintiff does not dispute that rumors are inadmissible hearsay. *See* Fed. R. Evid. 801(c) ("Hearsay means a statement that . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *see also* Fed. R. Evid. 802 ("Hearsay is not admissible."); *Benyard v. White Plains Hosp. Med. Ctr.*, No. 12-cv-1810, 2013 WL 6003733, at *5, 2013 U.S. Dist. LEXIS 161752, at *17 (S.D.N.Y. Nov. 12, 2013) (concluding that "rumors are hearsay"). Out-of-court statements may, however, still "be received in evidence for a purpose other than their truth." *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006). For example, an out of court statement offered as evidence of a witness' state of mind does not fall within the hearsay definition "because it was not offered to prove the truth of the matter asserted." *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (citing Fed. R. Evid. 801(c)). The proponent of such evidence "must satisfy Federal Rules of Evidence 401 and 403, that is, (1) the non-hearsay purpose for which the evidence is offered must be relevant and (2) the probative value of the evidence for this non-hearsay purpose must not be outweighed by the danger of unfair prejudice." *Paulino*, 445 F.3d at 217. But "the mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice." *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994).

To the extent Plaintiff seeks to offer Baggett's testimony regarding rumors in the SPD for the non-hearsay purpose of the effect they had on Galvin, there is no direct (or even

circumstantial evidence) that Galvin heard the rumors. Indeed, Baggett testified during his deposition that he did not know when he heard the rumors or who he heard the rumors from, he only recalled that they were "spread around the department." (Dkt. No. 99-14, at 21–23). Thus, the rumors carry little probative value. Overall, Baggett's testimony is conclusory, and in light of the fact that there were no details indicating Galvin's knowledge of the rumors,[11] and the risk that salacious rumor-based evidence would unfairly prejudice Thompson, the Court finds that the minimal probative value of this evidence is substantially outweighed by undue prejudice. Accordingly, Defendants' motion to preclude Baggett's testimony regarding rumors is granted.

### C. Other Acts of Sexual Misconduct

Defendants move to preclude evidence that Thompson engaged in other acts of sexual misconduct—some were reported to the SPD and others were not. The Court will address this evidence, including the motions concerning Melissa Popcun and Cheryle Bassett in a separate decision once briefing is complete.

### D. Deputy Chief Rebecca Thompson

Defendants seek to preclude any testimony by Deputy Chief Rebecca Thompson on the ground that her testimony would be irrelevant. (Dkt. No. 123-1, at 13). During her deposition, Deputy Chief Thompson was asked about an alleged romantic relationship with Defendant Thompson, which she denied, her role in the Popcun investigation, and her familial relationship with Defendant Galvin, her uncle. (Dkt. No. 123-1, at 13). Plaintiff responds that Deputy Chief Thompson's testimony is relevant and that she has a "good faith basis," based on Bassett's declaration, (Dkt. No. 99-10), and the declaration by Elizabeth Elbayadi, (Dkt. No. 99-15), for

---

[11] Plaintiff contends that Baggett will be more forthcoming at trial than he was in his deposition, (Dkt. No. 127-1, at 10–11), and at oral argument urged the Court to compel Baggett to appear, on Court order, for a second deposition and answer the questions he refused to answer during the first deposition. Plaintiff's counsel acknowledged he knew of no legal authority for this procedure.

"pursuing further the questioning of Rebecca Thompson regarding a romantic relationship with Chester Thompson." (Dkt. No. 127-1, at 14). While any questioning of Deputy Chief Thompson regarding her role in the Popcun investigation and her familial relationship with Defendant Galvin are certainly relevant areas for inquiry, given the thin and remote evidence—a one-time flirtation in the 1990 and Bassett's observations in the early 2000s—of any romantic relationship between Deputy Chief Thompson and Defendant Thompson, any evidence on that issue is precluded on the ground that the danger of unfair prejudice, wasting time, and confusing the issues outweighs any probative value. Accordingly, Defendants' motion is granted to the extent they seek to preclude evidence of a romantic relationship between Deputy Chief Thompson and Defendant Thompson, and is otherwise denied.

### E.    Plaintiff's Expert – Robert Brown

Defendants seek to preclude, under Rules 702, 703, and 704 of the Federal Rules of Evidence, Plaintiff's expert, Robert Brown, from testifying in this case. (Dkt. No. 123-1, at 15). Defendants argue that: (i) Brown is not qualified to proffer expert opinions regarding police department internal discipline; (ii) Brown's opinions are not the product of reliable principles and methods or based on definable, generally accepted standards; and (iii) Brown should be precluded from giving opinions on the ultimate issues in this case, including the City's alleged negligence and deliberate indifference. (Dkt. No. 123-1, at 15–27). Plaintiff opposes this motion. (Dkt. No. 127-1, at 15).

### 1.    Qualifications and Reliability

The Court is charged with a "gatekeeping" obligation with respect to expert testimony under Rule 702 of the Federal Rules of Evidence: the trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *Restivo v. Hessemann*, 846 F.3d 547, 575–76 (2d Cir. 2017) (internal quotation marks omitted). The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[ ] upon the particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

Defendants challenge Brown's qualifications as well as the reliability of his opinions, arguing that "he applied no methodology, commonly applied principles, methods or standards for his analysis." (Dkt. No. 123-1, at 22). The Court declines to preclude Brown from testifying. "Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

Brown served first with the New York City Housing Police, then, after the departments merged, with the New York City Police Department, and retired as a captain in 2000, with a total

of 15 years of service. (Dkt. No. 123-7, at 50, 57, 63). From 1994 to 1995, Brown was the commanding officer in the office of legal matters, where he was responsible "for every disciplinary case in the New Your City Housing Police." (*Id.* at 57–58). Later, with the NYPD, Brown worked as an integrity control officer in the legal bureau for one year and the license division for three years; in this role, he was a "liaison" between "Internal Affairs and any internal investigators." (*Id.* at 63–64). Prior to his retirement, Brown worked for one year in the special prosecutor's office, which administratively prosecuted officers accused of serious corruption and misconduct. (*Id.* at 51, 56). In this role, he "investigated allegations of police misconduct and conducted administrative interrogations . . . of police personnel accused of high-profile corruption and serious misconduct"; further, he "conducted a department-wide review of all open cases against members of the NYPD and made recommendations regarding strategy and penalties." (Dkt. No. 99-13, ¶ 1). Brown graduated from law school in 2000, and has been a practicing attorney, with an emphasis on criminal defense for the past 17 years. (Dkt. No. 99-13, ¶ 3). Since his retirement from the NYPD, Brown has attempted to stay "current" and receives and reviews updates to the NYPD procedural manual, (Dkt. No. 123-7, at 10), and is a member of the American Association of Law Enforcement Professionals, the Captain's Endowment Association, and the Fraternal Order of Police, all of which keep him "abreast of evolving norms of food and accepted police practice and issues relating to police misconduct." (Dkt. No. 99-13, ¶ 5).

Here, Plaintiff seeks to offer Brown as an expert on police disciplinary procedure. As he has 15 years of experience as a police officer and at least 5 years of experience in police disciplinary investigations and procedures, Brown appears to have sufficient knowledge and experience to testify regarding this subject matter. Defendants may explore their concerns that

Brown's experience as a police officer "is stale as it is almost 20 years in the past" and "underwhelming because he served only 15 years," (Dkt. No. 123-1, at 21), on cross-examination.

Defendants' objection to the reliability of Brown's testimony on the ground that "it is not the product of reliable principles and methods or based on any definable, generally accepted standards," does not warrant preclusion, either. Brown's opinions are based on his personal experience investigating police misconduct, overseeing police disciplinary procedures, recommending strategy and penalties in cases of police misconduct, as well as his review of the NYPD procedural manual and the documents and depositions generated in connection with the litigation" of this case. (Dkt. No. 99-13, ¶ 6). Because the subject matter on which Brown plans to testify concerns issues of police disciplinary procedures, the absence of a scientific methodology "subject to peer review" "that contains a known rate of error or is subject to controls," does not necessarily render Brown's testimony unreliable. Though not based on "traditional scientific methods," Brown's opinions are "nevertheless based on data—including personal experience . . . review of police manuals and other primary sources . . . —'of a type reasonably relied on by experts in various disciplines of social science.'" *Vasquez v. City of New York*, No. 10-cv-6277, 2014 WL 4388497, at *12, 2014 U.S. Dist. LEXIS 124483, at *34 (quoting *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001)). Thus, given the "flexible" reliability inquiry, *Daubert*, 509 U.S. at 594, and "the particular circumstances of this case," *Kumho Tire Co.*, 526 U.S. at 150, the Court concludes that Brown's reliance on his experience, the NYPD procedure manual, and review of the evidence in this case, are sufficient indicia of reliability to warrant introduction of his opinions to the jury. It is up to the jury to decide the weight to which his opinion is entitled. *See Vasquez*, 2014 WL 4388497, at *12, 2014

U.S. Dist. LEXIS 124483, at *34  (concluding that the opinions of the plaintiff's proposed expert on police practices and standards, which were not based on "traditional scientific methods," but, among other things, his years of experience with the NYPD, interviews, review of police manuals, were sufficiently reliable). Brown's "weaknesses on these fronts" are, however, "fair ground for cross-examination." *Id.*, 2014 WL 4388497, at *12, 2014 U.S. Dist. LEXIS 124483, at *34. Accordingly, Defendants' motion to preclude Brown from testifying is denied.

### 2.    Opinions as to Negligence and Deliberate Indifference

Defendants seek to preclude Brown from testifying "regarding any opinions that Galvin or the City was negligent, deliberately indifferent, failed to exercise reasonable care, or any other opinion regarding the legal implications or conclusions of factual conduct." (Dkt. No. 123-1, at 28). While an expert "may opine on an issue of fact within the jury's province," he "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Thus, expert testimony that "a practice condoned by the defendant municipality was 'contrary to the practice of most police departments,'" *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 4–6 (2d Cir. 1987)), would be admissible to show deliberate indifference but testimony that the practice *constituted* deliberate indifference or gross negligence, is not. For this reason, Brown's testimony that the SPD's investigations and responses to these prior reported allegations . . . deviated materially from good and accepted standards of police practice," is admissible so long as it is reliable.

Brown has proffered testimony that: "As a result of its inadequate response to the aforesaid reported allegations of malfeasance by Thompson, the SPD effectively permitted Thompson's misconduct to continue." (Dkt. No. 123-6, at 3). Again, evidence regarding whether the SPD's investigation and response were contrary to the practices of most police departments is

admissible. But the question of whether the SPD's inadequate response allowed Thompson's misconduct to continue impermissibly touches on the issue of causation and is, in any event, within the ken of the average juror—no expert testimony is required on this issue.

Defendants also seek to preclude Brown from testifying about the "inescapable conclusion" that Chief Fowler and Galvin had heard the rumors regarding Thompson's sexual misconduct and "deliberately ignored rumors that Thomson [sic] had sexually assaulted other women." (Dkt. No. 123-6, at 7). As the Court has ruled Baggett's testimony, and evidence regarding purported rumors, inadmissible, there is no basis for allowing Brown to testify on the issue of rumors. Accordingly, Defendants' request to preclude Brown from testifying about rumors is granted.

### F.     Paula Weinkauf and Charlene Emeterio

Defendants seek to preclude Paula Weinkauf and Charlene Emeterio, Plaintiff's current mental health providers, as witnesses on the ground that Plaintiff failed to identify or disclose them in her Rule 26 disclosures. (Dkt. No. 123-1, at 28 (citing Fed. R. Civ. P. 26)). Rule 37 provides that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). "[I]nstead of this sanction, the court, on motion and after giving an opportunity to be heard . . . may impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1)(C). The Second Circuit has identified factors to apply when considering whether preclusion of evidence is appropriate under Rule 37(c)(1): (1) the party's explanation for the failure to comply with its disclosure obligations; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).

According to Plaintiff's counsel, "[e]arlier this year . . . plaintiff independently sought out mental health counseling and treatment" and has been "treated by Paula Weinkauf and Charlene Emeterio." (Dkt. No. 127-1, at 19). On June 17, 2019, "one day after" Plaintiff informed her attorney of this treatment, Plaintiff's counsel "sent a disclosure pursuant to [Plaintiff's] continuing obligation under Fed. R. Civ. P. 26(e)." (*Id.*). In addition, Plaintiff's counsel sent Defendants authorizations allowing for the release of any records and, in July 2019, provided Defendants with Plaintiff's treatment records. (*Id.*). At oral argument, Defense counsel acknowledged that while the late disclosure could be cured via deposition, given the short time before trial, it would be difficult. On August 29, 2019, following oral argument, the Court issued a Text Order advising the parties that it would issue a written decision but that it did not expect "to preclude either witness from testifying" and directing Plaintiff to cooperate with Defendants in scheduling depositions of these witnesses. (Dkt. No. 149). There is, no doubt, prejudice to Defendants in having to conduct the depositions of these witnesses and determine how to respond to this new evidence in the few weeks remaining before trial. Having considered, however, (i) Plaintiff's diligence in disclosing Weinkauf and Emeterio, from whom she only recently began obtaining mental health treatment, as witnesses and the absence of any indication that she could have disclosed them sooner, (ii) the importance of the testimony of these witnesses to Plaintiff's claim for emotional damages, and (iii) the curative nature of depositions, the Court, in its discretion, declines to preclude them from testifying at trial. Accordingly, Defendants' motion to preclude Weinkauf and Emeterio from testifying is denied.

### G. Medical Professionals

Defendants seek to preclude Plaintiff from offering "any other medical professionals as expert witnesses." (Dkt. No. 123-1, at 30). The Court will address this issue in a separate decision once briefing is complete.

### H. Additional Witnesses

Defendants seek to "preclude testimony from any witness not listed in Plaintiff's Fed. R. Civ. P. 26 disclosures" as well as certain medical records. (Dkt. No. 123-1, at 31, 33). The Court will address this motion in a separate decision once briefing is complete.

### I. Medical Diagnoses

Defendants move to preclude "lay opinions of material witnesses as to medical diagnoses that require an expert." (Dkt. No. 123-1, at 34). Defendants argue that Plaintiff, and "her friends or family" may attempt to testify "regarding diagnoses purportedly given her by others." (Dkt. No. 123-1, at 34). Plaintiff opposes this motion on the ground that Defendants "fail to identify any such statements." (Dkt. No. 127-1, at 24). Defendants' motion is denied without prejudice to renewal at trial upon identification of such statements.

### J. Economic Damages

Defendants moves for an order limiting Plaintiff's economic damages to $2,705.44 and precluding Plaintiff "from offering evidence of any economic damages not disclosed in the Initial Disclosures." (Dkt. No. 123-1, at 35). Plaintiff responds that at the same time she disclosed the costs for treatment at a psychiatric center ($2,705.44), she also disclosed other costs, including, among other things, "past and future expenses for counseling sessions." (Dkt. No. 127-1, at 26). She asserts that "defendants inexplicably, accept and consent to plaintiff's economic damages claim of $2705.44, but take issue with other similar economic costs disclosed before and immediately after her disclosure of the $2705.44 figure." (Dkt. No. 127-1, at 26; Dkt. No. 127-6, at 2 (2016); Dkt. No. 127-7, at 3 (2017)). In view of Plaintiff's representations, Defendants' motion appears to lack merit. Accordingly, Defendants' motion is denied without prejudice to renewal upon a more specific record.

## IV. CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's motion in limine (Dkt. No. 122) is **granted in part and denied in part**; and it is further

**ORDERED** that Defendants' motion in limine (Dkt. No. 123) **is granted in part and denied** in part.

Dated:  September 9, 2019

Brenda K. Sannes
U.S. District Judge